**UNITED STATES of America**

v.

**John M. PURDY, Jr. and
Martin A. Ferris.**

**Crim. No. 3:95CR100 (JBA).**

United States District Court,
D. Connecticut.

July 16, 1996.

Jacob D. Zeldes, Brian E. Spears, Zeldes, Needle & Cooper, Bridgeport, CT, for defendants.

Christopher F. Droney, Mark G. Califano, U.S. Attorney's Office, New Haven, CT, for U.S.

### RULING ON DEFENDANT'S RENEWED MOTION TO DISMISS THE INDICTMENT [DOC. 67]

ARTERTON, District Judge.

Defendant Purdy moves to dismiss the indictment on the grounds that the grand jury which indicted him, N–95–1, was selected in violation of the Sixth Amendment, the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.*, and the Fifth Amendment. Specifically, the defendant contends that the system by which the grand jury was selected resulted in the underrepresentation of Blacks and Hispanics in violation of constitutional and statutory requirements. Hearings on the motion were held on February 12, 1996 and March 13, 1996.

### I. Introduction

The role of the jury in the American system of justice and American democracy, more generally, has often been touted by the Supreme Court. Two functions, in particular, have been noted. First, the jury system is a check on the power of government.

"The purpose of the jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." *Taylor v. Louisiana,* 419 U.S. 522, 529, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975).

The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence.

*Duncan v. Louisiana,* 391 U.S. 145, 155–156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968).

Secondly, the jury system provides an "opportunity for ordinary citizens to participate in the administration of justice." *Powers v.*

*Ohio,* 499 U.S. 400, 406, 111 S.Ct. 1364, 1368, 113 L.Ed.2d 411 (1991).

"[T]he institution of the jury raises the people itself, or at least a class of citizens, to the bench of judicial authority [and] invests the people, or that class of citizens, with the direction of society.... The jury ... invests each citizen with a kind of magistracy; it makes them all feel the duties which they are bound to discharge towards society; and the part which they take in the Government. By obliging men to turn their attention to affairs which are not exclusively their own, it rubs off that individual egotism which is the rust of society.... [T]he jury [is] one of the most efficacious means for the education of the people which society can employ."

*Id.,* at 407, 111 S.Ct. at 1368, *quoting* Alexis de Tocqueville, 1 *Democracy in America* 334–337 (Schocken 1st ed. 1961).

Thus, jury service, the Supreme Court has stated, simultaneously provides a popular check against arbitrary government, while providing an opportunity for civic education and fostering in the citizenry a confidence in the judicial system and a respect for law. *Id.*

The Court has stated, with equal clarity and force, that neither end is achieved if juries are not selected from a "fair cross section of the community." Thus, regarding the jury's function as a check on arbitrary government, the Court has written,

This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. "Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case.... [T]he broad representative character of

the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility."

*Taylor v. Louisiana,* 419 U.S. at 529–530, 95 S.Ct. at 698, *quoting Thiel v. Southern Pacific Co.,* 328 U.S. 217, 227, 66 S.Ct. 984, 989, 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting).

The Court has also recognized that the goal of fostering confidence in the judicial system and respect for law is undermined where juries are not selected from a fair cross section of the community. For example, regarding racial discrimination in jury selection, the Court has stated:

> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. Discrimination within the judicial system is most pernicious because it is "a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others."

*Batson v. Kentucky,* 476 U.S. 79, 87–88, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69 (1986), *citing Ballard v. United States,* 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946) and *McCray v. New York,* 461 U.S. 961, 968, 103 S.Ct. 2438, 2443, 77 L.Ed.2d 1322 (1983) (MARSHALL, J., dissenting from denial of certiorari), and *quoting Strauder v. West Virginia,* 100 U.S. 303, 308, 25 L.Ed. 664 (1880).

With these commitments in mind, the court examines defendant Purdy's claim that the grand jury which indicted him was not selected from a fair cross section of the community.

## II. Facts

The process by which grand and petit juries are selected in the District of Connecticut is described in some detail by Judge Burns in her ruling in *United States v. Rioux,* 930 F.Supp. 1558 (D.Conn.1995)

(Burns, J.), *appeal docketed,* No. 95–1542 (2nd Cir., October 6, 1995). However, there are additional facts which are relevant to the issues in this case and which require some discussion.

As Judge Burns indicated, after the construction of the master wheel, and its subsequent division into Hartford, New Haven, and Bridgeport master wheels, the General Services Administration ("GSA") mailed questionnaires to several thousand randomly selected names from the master wheels which instructed the recipients to return the questionnaires to the Clerk of the Court within ten days. Mailings of questionnaires occurred in late June 1993, late December 1993–early January 1994, and mid–March 1994. (Magistrate Margolis' Reports Pursuant to Second Restated Plan, Defs.' Motion To Take Judicial Notice of Material, Exhs. K, M, and P). Following each of these mailings, the Clerk's Office mailed a second questionnaire to every person who did not respond to the initial mailing; these follow-up mailings occurred in mid-to-late December 1993, early April 1994, and late May 1994. *Id.*

Initial questionnaires were also mailed in January 1995, however, follow-up questionnaires were not mailed to those persons who failed to respond to the January 1995 mailing until November 1995. Affidavit of Kevin Rowe, App. To Govt.'s Supp. Brief, at 170.

The grand jury which returned the indictment in this case, Grand Jury N–95–1, was summonsed on March 30, 1995 and impanelled on April 18, 1995. The indictment in this case was returned on June 22, 1995.

## III. Sixth Amendment

■ Defendant contends that Grand Jury N–95–1 was not selected from a fair and reasonable cross section of the community and therefore violates the Sixth Amendment. Sixth Amendment challenges to jury representativeness are analyzed under the three prong test developed in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and reiterated in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). To establish a prima facie case that a jury was not selected from a fair and reasonable cross section of the community, the de-

fendant must show (1) that the group alleged to be excluded is a distinctive group, (2) that the group's representation in the source from which juries are selected is not fair and reasonable in relation to the number of persons of that group in the community, and (3) that the underrepresentation results from systematic exclusion of the group in the jury selection process. *Duren,* 439 U.S. at 364, 99 S.Ct. at 668; *United States v. Jackman,* 46 F.3d 1240, 1245–1246 (2d Cir.1995); *Rioux,* 930 F.Supp. at 1564; *United States v. Osorio,* 801 F.Supp 966, 976–977 (D.Conn.1992) (Daly, J.).

### (1)

■■■ There is no dispute that Blacks and Hispanics constitute distinctive groups, *Jackman,* 46 F.3d at 1246, *citing United States v. Biaggi,* 680 F.Supp. 641, 648 (S.D.N.Y.1988), *aff'd,* 909 F.2d 662 (2d Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991), satisfying the first prong of *Duren.* The defendant, however, also asks the court to consider the extent of underrepresentation of Blacks and Hispanics combined into a single group. The court declines to do so and accepts the rationale of *Prince v. Parke,* 907 F.Supp. 1243, 1247 (N.D.Ind.1995):

> This court does not understand the requirement of a distinctive group under *Duren* to allow various groups to be 'lumped' together into one distinctive group called 'minorities.' Any group of persons which might casually be referred to as 'minorities' would have no internal cohesion, nor would it be viewed as an identifiable group by the population at large.

*Id.*

The first prong being satisfied, this analysis centers on the second and third prongs of the *Duren* test.

### (2)

As to the second prong, defendant contends that the representation of Blacks and Hispanics in the wheel from which the grand jury was selected was not fair and reasonable in relation to the number of Blacks and Hispanics in the community.

■■ **Community population.** While generally measuring community population in terms of the voting age population according to the most recent census, *United States v. Osorio,* 801 F.Supp. at 977–978; *Rioux,* 930 F.Supp. at 1564; *United States v. Fields,* 3:94cr258 (D.Conn., February 9, 1996) (Dorsey, J.), at 3, courts have not been unmindful of the flaws inherent in reliance on this measure. *See e.g., Fields,* at 3. Here, the government urges the court to adopt a measure of community population which is based not on the entire voting age population, but the qualified voting age population. That is, the government requests that the court compare the proportion of Blacks and Hispanics in the relevant jury pool with the proportion of Blacks and Hispanics in that segment of the voting age population which meets the various qualifications for jury service, including the English fluency requirement. The advantage to measuring community population in this fashion, according to the government, is that it enables the court to factor out of its measure of underrepresentation the impact of factors which do not implicate constitutional or statutory guarantees. However, this court will not depart from established precedent to adopt the government's proposed measure. Among other reasons, the measure relies upon speculative estimates regarding the proportion and makeup of the population which satisfies the qualifications for jury service. Moreover, neither the Second Circuit nor any Court in this district has utilized the measure which the Government proposes, even where the limitations on the measure have been duly noted. *Fields* at 3; and *Osorio,* 801 F.Supp. at 977–978.

Hence, while acknowledging the flaws in the established measure, but also the absence of a recognized or acceptable alternative, this Court will utilize the voting age population figures from the 1990 census as its measure of community population.

**Relevant Pool.** Defining the relevant jury pool involves two considerations. First, at what **stage** of the jury selection process is the defect being alleged operative: the master wheel, the qualified wheel, the venire, or the grand or petit jury. Second, at what **point in time** or over what **period of time** is the representativeness of the pool to be assessed? In *Rioux,* Judge Burns concluded

that the relevant jury pool is determined, on a case by case basis, by the defect in the jury selection system which is alleged. *Rioux,* 930 F.Supp. at 1564–68. In *Rioux,* for example, Judge Burns held that the relevant jury pool was the "qualified wheel over the life of the wheel" because the defendant alleged that the defect was in the process by which the wheel was constructed, namely that in compiling the wheel, efforts to include Hispanics were insufficiently aggressive to offset the low voter registration rates among Hispanics. *Id.,* 930 F.Supp. at 1575–76.

Hence to determine the relevant jury pool, this court must examine what defendant alleges to be the defects in the jury selection system to which he attributes the underrepresentation of Blacks and Hispanics. Defendant alleges three defects in the jury selection system to which he attributes the underrepresentation of Blacks and Hispanics. First, he alleges that because follow-up questionnaires were not mailed to the persons who did not respond to the January 1995 mailing, at least not prior to the summonsing of the grand jury venire from which N–95–1 was drawn, and because previous re-mailings had allegedly resulted in increased participation by Blacks and Hispanics, the failure to mail follow-up questionnaires caused the underrepresentation of Blacks and Hispanics.

Second, defendant alleges that the Court's failure to adopt the recommendations made by Magistrate Margolis in her reports of November 1993 and May 1994 is a systematic defect which caused Black and Hispanic underrepresentation. Defendant assumes, without evidence, that implementation of those recommendations would have increased minority participation.

Finally, defendant alleges that the Court failed to comply with the Jury Selection and Service Act and the Second Restated Plan for Random Selection of Grand and Petit Jurors and that this noncompliance caused minority underrepresentation, though there is no evidence on the record which shows that the alleged noncompliance would implicate minority participation.

Insofar as the defect alleged is the failure to remail questionnaires to persons who did not respond to the first questionnaire, the Court accepts the defendant's contention that the relevant pool is the qualified wheel at the time of the drawing of the venire for grand jury N–95–1, namely March 30, 1995.

The second and third alleged defects suggest that the life of the qualified wheel is the relevant pool because such defects would taint the jury pool from the outset.

Hence, based on the defendant's allegations, two relevant jury pools will be examined: the qualified wheel (1) at the time of the drawing of the venire for grand jury N–95–1, namely March 30, 1995, and (2) over the life of the qualified wheel.

■ **Method of comparison.** In *Rioux,* Judge Burns held that under a Sixth Amendment challenge, the appropriate measure of underrepresentation is the "absolute impact" measure, "which determines how many individuals from the distinctive group would have to be added to the typical venire in order to make the venire representative with respect to that group." *Rioux,* 930 F.Supp. at 1569.

The calculation of absolute impact involves two steps. First, the court must calculate the absolute disparity [which is defined as the difference between a group's representation in the population and its representation in the relevant jury pool]. Second the court must multiply the absolute disparity by the size of a typical venire. For example, an absolute disparity of 1% as applied to a venire of 100 jurors would result in an absolute impact of 1 juror. Thus a venire of 100 persons would have to include one more person from the distinct group in order to address the group's underrepresentation.

*Id.,* 930 F.Supp. at 1569. *Citing Jackman,* 46 F.3d at 1247 n. 4; *United States v. Gerena,* 677 F.Supp. 1266, 1271 (D.Conn.1986), *aff'd sub nom. United States v. Maldonado–Rivera,* 922 F.2d 934, 970 (2d Cir.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991).

Judge Burns concluded that even though the Second Circuit has expressed dissatisfaction with absolute impact as a method of comparison, *United States v. Jackman,* 46

F.3d at 1240, *United States v. Biaggi,* 909 F.2d at 678, *Alston v. Manson,* 791 F.2d 255, 259 (2d Cir.1986), *cert. denied,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), absolute impact has been employed in the circuit since *United States v. Jenkins,* 496 F.2d 57 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975); *Rioux,* 930 F.Supp. at 1576. *See United States v. Biaggi,* 909 F.2d at 678; *United States v. Maldonado–Rivera,* 922 F.2d at 970; and *United States v. Rosario,* 820 F.2d 584, 585 n. 1 (2d Cir.1987).

This Court, too, is mindful of the shortcomings of the absolute impact measure. In particular, as the Second Circuit noted in *Jackman,* "the absolute numbers approach is of questionable validity when applied to an underrepresented group that is a small percentage of the total population, because an underrepresentation of such a group that can be 'remedied' by adding only one or two members to a typical venire can lead to the selection of a large number of venires in which the members of the group are substantially underrepresented or even totally absent." 46 F.3d at 1247. However, unless the Second Circuit's decision in *Jackman* can be read as either categorically rejecting use of the absolute impact measure or as creating an exception when the measure is not to be used, this Court is bound by *Jenkins* and those cases in which courts have refused to re-examine the measure.

Defendant contends that *Jackman* requires that this court employ an alternative to the absolute impact measure because the *Jackman* majority refused to apply the absolute impact measure under the circumstances of the case before it. The *Jackman* court noted three reasons for not applying the absolute impact measure: the relatively small percentage of voting age Blacks and Hispanics in the Hartford Division, the existence of "circumstances less benign than use of voter registration lists," *quoting Biaggi,* 909 F.2d at 679, namely drawing names from a wheel from which were excluded residents of communities with relatively large minority populations, and the absence of a pool that was uniformly used as the source of venires. Neither the second nor third reasons which the *Jackman* majority gave for refusing to apply the absolute impact measure is applicable in this case. Only the first reason is applicable, and in *Biaggi,* the Court upheld application of the absolute impact measure despite its recognition of this limitation of the absolute impact measure. Moreover, as Judge Burns noted, "the [*Jackman*] majority calls the vitality of the absolute numbers approach into serious question without providing any guidance to the lower courts as to an appropriate substitute measure of underrepresentation." *Rioux,* 930 F.Supp. at 1572.

Bound by Second Circuit precedent, though mindful of the limitations of the measure, this court will apply the absolute impact measure as its measure of comparison.

### The Qualified Wheel of the New Haven Division on March 30, 1995

■ According to the 1990 census, 7.08% of the voting age population in the New Haven Division is Black. *Stipulation,* at 6. On March 30, 1995, Blacks comprised only 4.61% of the 1,137 persons in the Qualified Wheel of the New Haven Division on March 30, 1995. Def.'s Exh. 16. Hence, the absolute disparity was 2.47%. For a typical venire of 100 persons, therefore, the absolute impact is 2.47. That is, if a typical venire is assumed to be one hundred persons, the addition of two or three Blacks per venire would be required to make the venire representative of the population, at least with regard to Blacks.

According to the 1990 census, 4.24% of the voting age population in the New Haven Division is Hispanic. *Stipulation,* at 6. On March 30, 1995, only 1.77% of the persons in the Qualified Wheel of the New Haven Division were Hispanic. Def.'s Exh. 15. Hence, the absolute disparity was 2.47%, coincidentally the identical figure for the absolute disparity measure for Blacks. For a typical venire of 100 persons, therefore, the absolute impact is also 2.47. Again, if a typical venire is assumed to be one hundred persons, the addition of two or three Hispanics per venire would be required to make the venire representative of the population, at least with regard to Hispanics.

*The Qualified Wheel of the New Haven Division, October 1, 1993 to March 30, 1995*

 Blacks comprised only 5.88% of the 3,515 persons who constituted the Qualified Wheel of the New Haven Division over its lifetime, namely October 1, 1993 to March 30, 1995. *Stipulation,* ¶ 18. Hence, the absolute disparity was 1.20%. For a typical venire of 100 persons, therefore, the absolute impact is 1.2 persons.

Hispanics comprised only 2.5% of the persons who constituted the Qualified Wheel of the New Haven Division over its lifetime. *Id.* Hence, the absolute disparity was 1.74%. For a typical venire of 100 persons, therefore, the absolute impact is 1.74.

No cut-off has been set which establishes how large of a disparity is required before a Sixth Amendment violation is found. However, recalculating the figures presented in other cases to reflect a typical venire of 100 persons, and comparing the absolute impacts in those cases with those in this case, reveals that the extent of underrepresentation in this case is not greater than what has been upheld in other cases. The *Rioux* court, for example, which defined the relevant jury pool as the life of the qualified wheel, held that there was no Sixth Amendment violation where the absolute impact figures were 1.48 for Blacks and 1.94 for Hispanics. However, Judge Burns also held that were the court to find that the relevant jury pool was the qualified wheel on the day of the drawing of the venire, namely April 12, 1995, the extent of underrepresentation would also not be in violation of the Sixth Amendment. For an average venire of 100 persons, the absolute impact figures which Judge Burns held were not in violation of the Sixth Amendment were 2.73 and 2.62 for Blacks and Hispanics, respectively. Clearly, the absolute impact figures here reveal more representative pools than Judge Burns found not to be in violation of the Sixth Amendment. Moreover, in *United States v. Biaggi,* 909 F.2d at 678, the court held that there was no Sixth Amendment violation where, on an average venire of 100 persons, absolute impact figures were 3.6 for Blacks and 4.7 for Hispanics. Again the absolute impact figures indicate that the jury pools under review here were more representative than the jury pool under review in *Biaggi* which the Second Circuit found not to be in violation of the fair cross-section requirement of the Sixth Amendment. *Id.*

The Court concludes, therefore, that the extent of underrepresentation of Blacks and Hispanics in the Qualified Wheel of the New Haven Division, measured both over its lifetime and as of March 30, 1995, was not sufficiently large to constitute a violation of the Sixth Amendment.

(3)

In light of the finding that the extent of underrepresentation of Blacks and Hispanics is not sufficient to constitute a violation of the Sixth Amendment, it is not necessary to reach the third prong of the *Duren* test, namely systematic exclusion. However, because the Second Circuit has expressed serious reservations about the absolute impact measure and because alternative measures (e.g., statistical decision theory) yield results indicating more substantial underrepresentation, the Court will consider whether defendant can demonstrate that the underrepresentation of Blacks and Hispanics in the Qualified Wheel was the result of systematic exclusion.

In *Rioux,* the court held that under the systematic exclusion requirement the assessment of jury representativeness should take into account only "affirmative governmental action" and not "private sector influences." *Rioux,* 930 F.Supp. at 1572–73. Thus, the court stated that "failure to take affirmative measures to rectify underrepresentation caused by demographic patterns and a high disqualification rate for Hispanics" does not constitute systematic exclusion. *Id.,* at 1578. "Because the Sixth Amendment does not impose an affirmative obligation on the courts to counteract [such private sector influences as voting patterns, demographic trends, and cultural differences], the failure to do so cannot constitute systematic exclusion." *Id.* *See also Fields,* at 8, ("*Duren* does not require the government to justify, by a sufficient government interest, demographically caused underrepresentation. Nor does it mandate invalidation of the plan for failure to accommodate such factors.")

■ As indicated earlier, defendant alleges three systematic defects in the process by which the grand jury venire was constructed: failure to mail follow-up questionnaires to persons who did not respond to the May 1995 mailing, failure to follow Magistrate Margolis' recommendations for increasing minority participation, and failure to follow certain procedural requirements of the Jury Selection and Service Act and the Second Restated Plan. Because the district does not have an obligation under the Sixth Amendment to affirmatively counteract "private sector influences," neither the failure to mail follow-up questionnaires to persons who did not respond to the May 1995 mailing nor the failure to follow Magistrate Margolis' recommendations for increasing minority participation constitute "systematic exclusion." *Rioux,* at 1578. Nor does the third defect alleged, failure to follow certain procedural requirements of the Plan and Act, constitute systematic exclusion, *Rioux,* at 1578–79, particularly in light of the absence of evidence that failure to follow these procedures resulted in or was the cause of underrepresentation of Blacks and Hispanics in the venire from which Grand Jury N–95–1 was selected.

Hence, defendant has not shown that the underrepresentation of Blacks and Hispanics in the venire from which Grand Jury N–95–1 was selected resulted from systematic exclusion of the group in the jury selection process. This Court finds that the system by which Grand Jury N–95–1 was selected did not violate the Sixth Amendment.

### IV. Jury Selection and Service Act

■ Under 28 U.S.C. § 1867(d), the court may dismiss an indictment where "there has been a substantial failure to comply with the provisions of [the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.,* ("the Act") ] in selecting the grand jury." A "substantial failure" occurs when the violation of the Act frustrates the policy objectives of the Act, namely the random selection of jurors and the objective determination of juror disqualification, exemptions and excuses. *Rioux,* at 1580–81, *citing United States v. Bearden,* 659 F.2d 590, 601 (5th Cir.1981), *cert. denied sub nom. Northside Realty Association v. United States,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). Mere technical violations which do not implicate the Act's policy objectives do not constitute substantial failures. *Id.* (Citations omitted.)

The parties are in dispute as to whether the test for a violation of the cross section requirement of the Act is substantially the same as the cross section requirement of the Sixth Amendment. In *Rioux,* Judge Burns observed that "the majority of lower courts have interpreted the Act as codifying the fair cross-section requirement of the Sixth Amendment," at 1579 *citations omitted,* but also noted that "the Second Circuit has suggested that the Act may require use of supplemental sources when the voter registration lists do not achieve a fair and reasonable cross-section, even in the absence of systematic discrimination," *Id.,* at 1579, *citing Jenkins,* 496 F.2d at 65.

Defendant alleges the following violations of the Act and the District of Connecticut's Second Restated Plan for Random Selection of Grand and Petit Jurors ("Plan"), adopted pursuant to the Act: (1) failure to adopt the recommendations of Magistrate Margolis contained in the October 1993 and the April 1994 reports relating to the underrepresentation and disqualification of minorities; (2) the failure to mail follow-up questionnaires to persons who did not respond to the January 4, 1995 mailing; (3) use of the November 1992 voter registration lists and January 1993 motor vehicle records as source lists when more accurate and current lists were available; (4) failure to utilize the United States Marshal to effectuate service of questionnaires that were returned as undeliverable; (5) failure to issue public notices regarding the drawing of names for the New Haven Master Wheel and the New Haven Qualified Wheel and the failure to conduct those drawings in public; (6) failure to summons persons who failed to return completed questionnaires; (7) failure to keep a current list of persons who could not be located by mail or personal service; and (8) the failure to provide certain certifications for filing with the Clerk regarding the operation of the New Haven Master Wheel and the New Haven Qualified Wheel, including certifications

of the following: (a) certification by the General Services Administration of the number of questionnaires printed, the number of questionnaires printed for each subdivision, the total number of registered voters sent questionnaires, the percentage of questionnaires, and the randomness of the selection, with respect to subsequent mailings; (b) certification by the Jury Systems Supervisor ("Supervisor") of the number of questionnaires mailed; (c) certification by the Supervisor of the total number of undeliverable questionnaires returned by the Postal Service and the number of undeliverable questionnaires for each town as to subsequent mailings; (d) certification by the Supervisor of the total number of qualified questionnaires, the number of qualified questionnaires for each subdivision, the total number of registered voters for each subdivision and the number of qualified questionnaires for each subdivision as a percentage of total voter population for that subdivision; (e) certification by the Supervisor of receipt by computer contractor of questionnaires; (f) certification by the General Services Administration that all questionnaires deposited with it have been entered in the qualified wheel pursuant to quality control procedures that meet industry standards; and (g) certification by the General Services Administration that prospective jurors were selected at random from the qualified wheel in the creation of venires from January 1994 to the present.

 This court finds that none of the alleged violations is a substantial violation which would justify dismissal of the indictment. (1) In *Rioux,* Judge Burns held that "the failure to adopt the recommendations of the magistrate, with respect to increasing minority representation in the qualified wheel is not a violation of the Act or the policies advanced by the Act." *Rioux,* at 1581. This court accepts Judge Burns' reasoning that "[n]othing in the Act or in any other law imposes an affirmative obligation on the courts to counteract private sector influences beyond the source lists, the initial stage of the selection process." *Id.* Citing *United States v. Gometz,* 730 F.2d 475, 479–480 (7th Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984); *United States v. Santos,* 588 F.2d 1300, 1303 (9th Cir.), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); and *United States v. Carmichael,* 685 F.2d 903, 912 (4th Cir.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983).

 (2) Mailing follow up questionnaires to persons who fail to respond to the initial questionnaire is not required under the Act, *see, e.g., United States v. Santos,* 588 F.2d at 1303 (failure to follow up questionnaires not returned to the clerk does not constitute non-compliance with the Act), and therefore failure to mail follow up questionnaires is not a substantial failure to comply with the Act. However, the Plan provides that "[f]or those questionnaires not returned, the Jury Systems Supervisor shall mail a second questionnaire together with a letter explaining the need for prompt compliance." *Plan,* § XVIII. Follow-up questionnaires were, in fact, mailed after the initial mailings of June 1993, December 1993–January 1994, and March 1994. The initial mailing on January 1995 was not followed up until November 1995, after the Grand Jury N–95–1 was summonsed and impanelled. The court finds that the delay in the mailing of this most recent follow up questionnaire, does not threaten the policy objectives of the Act and, therefore, does not constitute a substantial failure requiring dismissal of the indictment.

 (3) The Plan provides that "[t]he Master Jury Wheel shall be emptied and refilled as herein provided, between the first Tuesday in November not falling on the first of the month and the 30th day of April every two (2) years, or sooner as may be ordered by the Chief Judge or his/her designee." *Plan,* § 10. Under the terms of the Plan, the Master Wheel was to be emptied and refilled by October 1995. Transcript, at 54. However, on November 3, 1995, the Second Circuit granted the district's request for a one-year postponement of this requirement, *nunc pro tunc. Magistrate Judge's Report,* November 1995, at 5, n. 3. Therefore, the failure to empty and refill the Master Wheel within two years of its creation is not a substantial failure to comply with the Act or the Plan.

■ The Act provides that "[a]ny person who fails to return a completed juror qualification form as instructed may· be summoned by the clerk or jury commission forthwith to appear before the clerk of jury commission to fill out a juror qualification form." 28 U.S.C. § 1864(a). The Plan's language is nearly identical. *Plan*, § 10. Because neither. the Act nor the Plan requires that the clerk summon persons who do not respond to the questionnaire or utilize the United States Marshall to effectuate service of the questionnaires, neither the failure to summon persons who did not respond (6) or the failure to effectuate service of the questionnaires by means of the United States Marshall (4) can constitute a substantial failure to comply with the Act or the Plan. *Rioux*, at 1581; *United States v. Gometz*, 730 F.2d at 480 ("The Act empowers—not requires—the clerk to pursue those who fail to return their juror qualification forms.")

■ (5) The Plan provides that the drawing of names from the Master Wheel, § X, and the drawing of names from the Qualified Wheel, § XII, shall be public. The Act also requires that the drawing of names from the master jury wheel and the qualified jury wheel be public. 28 U.S.C. §§ 1864(a), 1866(a), 1869(k). However, courts have held consistently that the failure to issue public notices regarding the drawing of names for master wheels and the failure to conduct those drawings in public constitute technical, rather than substantial, violations of the Act. *Rioux*, at 1582; *United States v. Capone*, 683 F.2d 582, 589 (1st Cir.1982); *United States v. Bearden*, 659 F.2d at 603–604.

■ (7) The Plan provides that "[t]he Clerk or Jury Commission shall prepare a list of persons ... who could not be located either by mail or through personal service by the Marshal." *Plan*, § 10. However, the failure to comply with this provision of the Plan is a technical violation and not a substantial violation. *Rioux*, at 1582.

■ (8) The Plan requires that various certifications be provided by the General Services Administration and the Jury Systems Supervisor. *Plan*, § XVIII. Here, again, the failure to comply with a certification provision is a technical violation and not a substantial violation which threatens the policy objectives of the Act and which might justify dismissal of the indictment.

Given that none of the violations of the Act or Plan alleged by the defendant is a substantial violation, this Court holds that dismissal of the indictment under 28 U.S.C. § 1867(d) is improper.

### V. Fifth Amendment

■ In the Second Circuit, Fifth Amendment equal protection challenges to jury selection are analyzed under a three-part test announced in *Alston v. Manson, supra*, explicating the Supreme Court's ruling in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). Under that test, the defendant can establish .a prima facie case of underrepresentation only if they can show that (1) a cognizable group is (2) substantially underrepresented and (3) that the selection procedure is not racially neutral.[1]

#### (1)

■ Again, there is no question that Blacks and Hispanics constitute cognizable groups within the meaning of the *Alston* test. *Supra*, at 1098.

#### (2)

■ A key difference between a Sixth Amendment challenge and a challenge under a Fifth Amendment equal protection claim is that, in the case of the latter, in order to

---

1. A close look at *Castaneda* suggests that the Supreme Court developed a two-part test, namely factors (1) and (2), finding that (3) merely goes to supporting the presumption of intent that comes with finding (2). This discrepancy was noted by the Second Circuit in *Biaggi*, but the Court "felt bound" by *Alston*.

A review of the jury challenge case law indicates that the *Alston* view of *Castaneda* is nearly universal. That is, most courts, including the Supreme Court, view *Castaneda* as creating a three-part test. *See Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979); *United States v. Esquivel*, 75 F.3d 545 (9th Cir.); and *James v. Whitley*, 39 F.3d 607 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1704, 131 L.Ed.2d 565 (1995).

establish substantial underrepresentation, "statistical decision theory," rather than "absolute impact," is to be applied. *Rioux*, at 1582, citing *Alston*, 791 F.2d at 258. "Statistical decision theory" ("SDT") measures the likelihood that deviations from representativeness (i.e., when the percentage of the members of the cognizable group in the pool is equal to the percentage of members of that group in the community) occurred by chance. *Stipulation*, ¶ 23.

■ Of 1127 persons in the Qualified Wheel on March 30, 1995, 52 were Black and 20 were Hispanic. Defendant's expert, Professor Ian Ayres, testified that the probability that the number of Blacks in the Qualified Wheel as of March 30, 1995 would be 52 or less was 1 in 2,464, while the probability that the number of Hispanics in the Qualified Wheel as of March 30, 1995 would be 20 or less was 1 in 305,510. Defendant's Exhibits 15 and 16. Of the 3,488 persons in the Qualified Wheel over its lifetime (i.e., from October 1, 1993 to March 30, 1995), 205 were Black and 89 were Hispanic. *Id.* Professor Ayres testified that the probability that the number of Blacks in the Qualified Wheel over its lifetime would be 205 or less was 1 in 395, while the probability that the number of Hispanics in the Qualified Wheel over its lifetime would be 89 or less was 1 in 14,482,448. *Id.*

While the Second Circuit has provided relatively little guidance as to the extent of underrepresentation that would constitute a prima facie case of underrepresentation under the Fifth Amendment, the data presented to the Court by Professor Ayres clearly establish that "chance alone" cannot "account for [the] meager representation of minorities" on the qualified wheel. *Alston*, 791 F.2d at 258.

### (3)

A finding of substantial underrepresentation, however, does not conclude the court's analysis. Relying on *Alston*, district courts in the Second Circuit have denied jury selection challenges where the first two prongs were satisfied, but the challenger failed to establish that the accused system was "susceptible of abuse or not racially neutral." *Fields, supra*, and *Biaggi, supra*.

■ The defendant contends that alleged failures to comply with the Act and the Plan demonstrate that the system of jury selection under review is "susceptible of abuse or not racially neutral." In particular, defendant's claim that nonpublic drawings and noncertification create the opportunity for abuse, i.e., racial discrimination in the selection of jurors. However, an examination of the few instances in which courts have found that this third prong, susceptibility to abuse or racial non-neutrality, has been satisfied indicates quite clearly why it is not satisfied here. In *Castaneda*, the Supreme Court found that Texas' "key man" system of grand juror selection, wherein "jury commissioners ... select prospective grand jurors from the community at large," 430 U.S. at 484, 97 S.Ct. at 1275, is "highly subjective" and "susceptible of abuse as applied." As to the system's susceptibility to abuse, the Court cited its earlier holding in *Hernandez v. Texas*, 347 U.S. 475, 479, 74 S.Ct. 667, 671, 98 L.Ed. 866 ("... the system is susceptible to abuse and can be employed in a discriminatory manner."), which, in turn, cited, among other decisions, *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940), wherein Justice Black, writing for the Court, wrote:

> Here, the Texas statutory scheme is not in itself unfair; it is capable of being carried out with no racial discrimination whatsoever. But by reason of the wide discretion permissible in the various steps of the plan, it is equally capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable.

*Id.*, at 130–131, 61 S.Ct. at 165–66.

In *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1971), the Court held that the following grand jury selection procedure was "not racially neutral:"

> The [jury] commission compiled a list of names from various sources ... and sent questionnaires to the persons on this list to determine those qualified for grand jury service. The questionnaire included a space to indicate the race of the recipient.... [T]he jury commissioners attached to each questionnaire an information card designating, among other things, the race of the person.... The commissioners then culled out ... questionnaires,

ostensibly on the ground that these persons were not qualified for grand jury service or were exempted under state law. *Id.*, at 627–628, 92 S.Ct. at 1223.

The Court added: "The racial designation on both the questionnaire and the information card provided a clear and easy opportunity for racial discrimination. At two crucial steps in the selection process ... these racial identifications were visible on the forms used by the jury commissioners, although there is no evidence that the commissioners consciously selected by race." *Id.*, at 630, 92 S.Ct. at 1225.

In *Alston, supra,* the statutory scheme under review utilized a strict quota system under which each town furnished a particular number of prospective jurors to the county jury array. *Id.*, at 256. Given that "a larger concentration of the black population in Connecticut lives in the more populated urban settings," the system resulted in substantial underrepresentation of Blacks. *Id.*, at 256–257. The court held that "[t]he **ineluctable effect** of the statutory scheme was to reduce the number of potential jurors drawn from the large towns ... where it is undisputed that a large proportion of blacks resided." *Id.*, at 257. Emphasis added.

There is no evidence in the record that the jury selection process utilized in the Connecticut district at the time of the defendant's indictment was susceptible to abuse, in the sense that it was "capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable," *Smith v. Texas,* 311 U.S. at 130–131, 128, 61 S.Ct. at 165–66, 164 or that it "provided a clear and easy opportunity for racial discrimination." *Alexander v. Louisiana,* 405 U.S. at 630, 92 S.Ct. at 1225.

Nor would the record support a finding that the "ineluctable effect" of the features of the jury selection process identified by the defendant as "susceptible of abuse or not racially neutral," namely the alleged failures to comply with the Act and the Plan, was to reduce the number of Black or Hispanic prospective jurors. In fact, defendant's expert witness, Professor Ayres, conceded that the statistical models which he employed cannot sort out, as it were, the effects of the allegedly discriminatory features from factors such as lower voter registration rates, lower questionnaire return rates, and higher disqualification rates which may also contribute to the underrepresentation of Blacks and Hispanics. Transcript, at 134.

In the absence of any showing that the jury selection process under review was susceptible of abuse or not racially neutral, defendant's equal protection challenge cannot be sustained. *See also Rioux,* at 1582–83 ("the defendant has failed to establish that the jury selection process in the New Haven division was susceptible of abuse") and *Field,* at 6 ("Failure to register, to obtain a driver's license, to provide forwarding addresses on moving and to return jury questionnaires are all benign factors which preclude a finding that the plan's selection process is not racially neutral.").

Defendant has failed to establish that the system by which Grand Jury N–95–1 was selected violated the Fifth or Sixth Amendments or the Jury Selection and Service Act. Accordingly, defendant's motion to dismiss the indictment is DENIED.

IT IS SO ORDERED.