PEOPLE v SMITH

Docket No. 114785. Argued April 5, 2000 (Calendar No. 1). Decided
July 28, 2000.

Diapolis Smith was convicted by a jury in the Kent Circuit Court,
Michael R. Smolenski, J., of second-degree murder and possession
of a firearm during the commission of a felony. The Court of
Appeals, MARKEY, P.J., and HOEKSTRA and J. C. KINGSLEY, JJ., denied
the defendant's request for a remand for a new trial on the ground
that he was denied his right to an impartial jury drawn from a fair
cross section of the community. After argument, however, the
Court, sua sponte, remanded the case in an unpublished order for
an evidentiary hearing on the defendant's allegations of impropriety
in the selection of the jury venire (Docket No. 172558). Thereafter,
the trial court, Paul J. Sullivan, J., concluded that the defendant
had not shown that he was denied his right to an impartial jury.
The Court of Appeals, MARKEY, and J. C. KINGSLEY, JJ. (HOEKSTRA, P.J.,
concurring in part and dissenting in part), remanded for a new trial
in an unpublished opinion per curiam. The people appeal.

In an opinion by Justice CORRIGAN, joined by Chief Justice
WEAVER, and Justices TAYLOR, YOUNG, and MARKMAN, the Supreme
Court *held*:

The defendant was not denied his Sixth Amendment right to an
impartial jury drawn from a fair cross section of the community. To
establish a prima facie violation of the cross-section requirement, a
defendant must show that a distinctive group was under-
represented in his venire or jury pool, and that the under-
representation was the result of systematic exclusion of the group
from the jury selection process.

1. The United States Supreme Court has stated that the Sixth
Amendment guarantee for criminal defendants of a trial by an
impartial jury requires that the jury be drawn from a fair cross sec-
tion of the community, i.e., a source fairly representative of the
community. The fair cross-section requirement, however, does not
guarantee that any particular jury actually chosen must mirror the
community. Rather, for the fair cross-section requirement to be sat-
isfied, venires from which juries are drawn must not systematically

exclude distinctive groups in the community and thereby fail to be reasonably representative of them.

2. A criminal defendant who claims that the fair cross-section requirement has not been satisfied must prove three elements, as set forth in *Duren v Missouri*, 439 US 357 (1979), that the group alleged to be excluded is a distinctive group in the community, that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and that this underrepresentation is due to systematic exclusion of the group in the jury selection process. In this case, the defendant easily satisfies the first prong of the *Duren* analysis. Black Americans are a constitutionally cognizable group because they are capable of being singled out for discriminatory treatment and have been held to be a distinctive group for jury composition challenges.

3. The United States Supreme Court has not specified the preferred method for measuring whether representation of a distinctive group in the jury pool is fair and reasonable, although, since *Duren*, courts have applied three different methods of measuring fair and reasonable representation: the absolute disparity test, the comparative disparity test, and the standard deviation test. Because each test has been criticized, no individual method should be used exclusive of the others. Rather, a case-by-case approach is to be employed. Provided that the parties proffer sufficient evidence, courts should consider the results of all the tests in determining whether representation was fair and reasonable. In this case, the defendant presented some evidence of a disparity between the African-Americans eligible for jury duty and the actual number of African-American prospective jurors selected for the Kent Circuit Court jury pool list. However, the defendant's statistical evidence failed to establish a legally significant disparity under either the absolute or comparative disparity tests. Nevertheless, rather than leaving the possibility of systematic exclusion unreviewed solely on the basis of the defendant's failure to establish underrepresentation, and giving the defendant the benefit of the doubt on underrepresentation, under *Duren*, as a final step in establishing a fair cross-section violation, the defendant must show that the underrepresentation of black jurors was systematic, i.e., inherent in the particular jury-selection process utilized. The defendant has not carried his burden on this step. Further, the influence of social and economic factors on juror participation does not demonstrate a systematic exclusion of African-Americans. The Sixth Amendment does not require Kent County to counteract these factors. Finally,

even presuming that the defendant can rely exclusively on statistics, he has not made the requisite showing.

Justice CAVANAGH, joined by Justice KELLY, concurring, stated that the defendant was not denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community, because, assuming unfair and unreasonable underrepresentation, he has not shown systematic exclusion. To establish that this right was denied, a criminal defendant must show that a distinctive group was underrepresented in his jury venire, and that the underrepresentation was the result of systematic exclusion of the group from the jury selection process. The defendant did not make the requisite showing under *Duren*.

The United States Supreme Court has stated that the Sixth Amendment guarantee for criminal defendants of a trial by an impartial jury requires that the jury be drawn from a fair cross section of the community, i.e., a source fairly representative of the community. The fair cross-section requirement, however, does not guarantee that any particular jury actually chosen must mirror the community. Rather, for the fair cross-section requirement to be satisfied, venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative of them.

A criminal defendant who claims that the fair cross-section requirement has not been satisfied must prove that the group alleged to be excluded is a distinctive group in the community, that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

In this case, the defendant easily satisfies the first prong of the analysis. Black Americans are a constitutionally cognizable group because they are capable of being singled out for discriminatory treatment and have been held to be a distinctive group for jury composition challenges. To satisfy the second prong of *Duren*, the defendant must prove that the number of prospective black jurors in the jury pool is not fair and reasonable in relation to the black population in Kent County.

Courts have applied three different methods of measuring fair and reasonable representation: the absolute disparity test, the comparative disparity test, and the standard deviation test. In addition, in *People v Hubbard (After Remand)*, 217 Mich App 459 (1996), the Court of Appeals adopted a different approach, under which a court may glance ahead at the evidence of systematic exclusion

when deciding whether representation of the distinctive group is fair and reasonable. When the showing of underrepresentation is close, or none of the methods of analysis are particularly well suited to a case, a court can consider the defendant's evidence of systematic exclusion. If a jury selection process appears ex ante likely to systematically exclude a distinctive group, that is, the system contains "non-benign" factors, a court may essentially give a defendant the benefit of the doubt on underrepresentation, even if the system ex post proves to work no systematic exclusion.

In this case, the defendant has not shown underrepresentation under either the absolute disparity test, the comparative disparity test, or standard deviation analysis. Under each approach, the underrepresentation was below levels that have been held unfair and unreasonable. However, because the jury-eligible black population of Kent County is small, and the sample of the overall population represented by the jury pools is also small, none of the analytical methods are particularly well suited to the defendant's case. Further, the facial similarity between the jury selection system and the system held constitutionally impermissible in *Hubbard* is a thumb on the scale when weighing underrepresentation. Thus, although the defendant has not shown unfair and unreasonable underrepresentation under the disparity analyses, the jury selection process bears the mark of a "non-benign" influence. Leaving this possibility of systematic exclusion unreviewed because the disparities in this case were not large creates the possibility that a systematic exclusion could be acceptable if only its effects were small enough. To prevent this, under the approach taken in *Hubbard*, the defendant should be given the benefit of the doubt on underrepresentation, and the Court should glance ahead to the third prong of the *Duren* analysis.

Reversed and remanded.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *William A. Forsyth*, Prosecuting Attorney, and *Timothy K. McMorrow*, Chief Appellate Attorney, for the people.

*James Sterling Lawrence* for the defendant.

CORRIGAN, J. The question presented in this case is whether Kent County's former system of selecting jurors denied defendant his Sixth Amendment right to an impartial jury drawn from a fair cross section of

the community. To establish a prima facie violation of the fair cross-section requirement, a defendant must show that a distinctive group was underrepresented in his venire or jury pool, and that the underrepresentation was the result of systematic exclusion of the group from the jury selection process. *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979). We hold that defendant was not denied this right because, although we grant him the benefit of the doubt on unfair and unreasonable underrepresentation, he has not shown systematic exclusion. Accordingly, we reverse the decision of the Court of Appeals and remand this case to the Court of Appeals for consideration of defendant's remaining issues.

I

We join parts I through II(A) and part II(C)(2) of the concurring opinion, but part company with our concurring colleague on the analysis of the second prong of *Duren*.

The United States Supreme Court has not specified the preferred method for measuring whether representation of a distinctive group in the jury pool is fair and reasonable. See Detre, note, *A proposal for measuring underrepresentation in the composition of the jury wheel*, 103 Yale L J 1913, 1918-1920 (1994). Since *Duren*, the lower federal courts have applied three different methods of measuring fair and reasonable representation, known as the absolute disparity test, the comparative disparity test, and the standard deviation test. *Ramseur v Beyer*, 983 F2d 1215, 1231 (CA 3, 1992). Each of these tests, however, has been criticized. For example, in cases where the members

of the distinctive group comprise a small percentage of those eligible for jury service, the absolute disparity test produces questionable results. See *United States v Jackman*, 46 F3d 1240, 1247 (CA 2, 1995). Likewise, most courts have rejected the comparative disparity analysis because when the distinctive group's population is small, a small change in the jury pool distorts the proportional representation. See *United States v Royal*, 174 F3d 1, 8 (CA 1, 1999). Finally, courts have applied a standard deviation analysis in Fourteenth Amendment cases, but not typically in Sixth Amendment cases. Detre, *supra* at 1922-1926. Some courts have used standard deviation analyses, see *Jackman, supra; Ramseur, supra*, but "no court in the country has accepted [a standard deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems." *United States v Rioux*, 97 F3d 648, 655 (CA 2, 1996).

We thus consider all these approaches to measuring whether representation was fair and reasonable, and conclude that no individual method should be used exclusive of the others. Accordingly, we adopt a case-by-case approach. Provided that the parties proffer sufficient evidence, courts should consider the results of all the tests in determining whether representation was fair and reasonable.

In this case, defendant presented some evidence of a disparity between the number of jury-eligible African-Americans and the actual number of African-American prospective jurors selected to the Kent County Circuit Court jury pool list. However, defendant's statistical evidence failed to establish a legally significant disparity under either the absolute or com-

parative disparity tests.[1] Nevertheless, rather than leaving the possibility of systematic exclusion unreviewed solely on the basis of defendant's failure to establish underrepresentation, we give the defendant the benefit of the doubt on underrepresentation and proceed to the third prong of the *Duren* analysis.

II

Assuming defendant has satisfied the first two prongs of the *Duren* analysis, defendant must still show that the underrepresentation of African-American jurors was systematic, "that is, inherent in the particular jury-selection process utilized." *Duren*, *supra* at 366. We agree with our concurring colleague that defendant has not shown a systematic exclusion of African-Americans from the Kent County Circuit Court jury pool.

We further agree with our concurring colleague that defendant has not shown how the alleged siphoning of African-American jurors to district courts affected the circuit court jury pool. The record does not disclose whether the district court jury pools contained more, fewer, or approximately the same percentage of minority jurors as the circuit court jury pool. Defendant has simply failed to carry his burden of proof in this regard.

---

[1] We note that neither defendant nor the prosecution presented expert testimony regarding application of the standard deviation test. We do not endorse our concurring colleague's efforts to craft his own standard deviation analysis from the available data. Nor do we approve the concurring opinion's endorsement of *People v Hubbard (After Remand)*, 217 Mich App 459; 552 NW2d 493 (1996). The constitutional conclusion *Hubbard* reached has not been adequately briefed, and we need not reach that question to resolve this case.

We also agree with our concurring colleague that the influence of social and economic factors on juror participation does not demonstrate a systematic exclusion of African-Americans. The Sixth Amendment does not require Kent County to counteract these factors. *United States v Purdy*, 946 F Supp 1094, 1104 (D Conn, 1996).[2]

Finally, even presuming that defendant can rely exclusively on statistics, he has not made the requisite showing in this case. In *Duren*, the Court noted that the defendant proved that a large discrepancy occurred in every weekly venire for approximately one year.[3] *Duren, supra* at 366. Here, while defendant's proof may satisfy any duration requirement, the disparities over that time fell far short of those in *Duren*. Defendant did not demonstrate unfair and unreasonable underrepresentation under the disparity analyses. We therefore conclude that defendant has

---

[2] Although the constitution does not concern itself with problems not inherent in a jury selection process that nevertheless may adversely affect jury participation, this Court, through the State Court Administrative Office, has been studying ways to increase jury participation. We have undertaken several initiatives in recent years to address concerns about juries and jury service. For example, in 1998, the State Court Administrative Office began reviewing the American Bar Association Standards Relating to Juror Use and Management with an eye to producing Michigan standards. Similarly, this Court retained the National Center for State Courts Center for Jury Management to address the jury selection and management procedures in trial courts where jury concerns had been raised, and to make recommendations for improvement in those courts. Finally, this Court has worked with the State Bar of Michigan Open Justice Commission to improve citizen participation in jury service, focusing on improving the representativeness of juries.

[3] In *Duren*, the Court specifically concluded that the petitioner had demonstrated that the underrepresentation was due to the operation of the exemption criteria. *Duren, supra* at 367. Therefore, *Duren* did not hold that the third prong was established solely on the basis of statistical proof; there was also proof of the cause of the underrepresentation.

not shown a systematic exclusion of African-Americans for the Kent County Circuit Court jury pool.

III

We conclude that defendant has not established a prima facie violation of the Sixth Amendment fair cross-section requirement. We therefore reverse the decision of the Court of Appeals, and remand this case to the Court of Appeals for consideration of defendant's remaining issues.

WEAVER, C.J., and TAYLOR, YOUNG, and MARKMAN, JJ., concurred with CORRIGAN, J.

CAVANAGH, J. (concurring). In this case, the Court must decide whether Kent County's former system of selecting jurors denied defendant his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community. To establish that this right was denied, a criminal defendant must show that a distinctive group was underrepresented in his jury venire, and that the underrepresentation was the result of systematic exclusion of the group from the jury selection process. Duren v Missouri, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979). I would hold that defendant was not denied this right because, although I would grant him the benefit of the doubt on unfair and unreasonable underrepresentation, he has not shown systematic exclusion. Accordingly, I would reverse the decision of the Court of Appeals and remand this case for consideration of defendant's previously unreviewed issues.

I

Defendant's conviction arises out of a Grand Rapids bar fight that occurred in November 1991. One patron was shot to death in the fight, and a bullet also struck the bar's bouncer when he tried to intervene in the fracas. On the basis of these events, defendant was charged with murder, assault, and possession of a firearm during the commission of a felony, and was tried in September and October 1993.

At the conclusion of the jury voir dire, defendant objected to the lack of any black jurors, alleging bias in the jury selection process. The number of prospective jurors that were in the pool is not clear; the trial court estimated that sixty prospective jurors were requested for venire, and defendant estimates that one hundred were requested. Both estimate that three of these prospective jurors were black, and agree that none of the thirty-seven examined were black. Defendant requested more peremptory challenges to cure this, but the trial court denied his request, finding no bias in the selection. The jury seated found defendant guilty of second-degree murder and felony-firearm, and the trial court sentenced him to life in prison.

Defendant appealed, requesting a remand for a new trial on the ground that he was denied his right to an impartial jury drawn from a fair cross section of the community. The Court of Appeals denied that request, but, after argument, it sua sponte remanded defendant's case for an evidentiary hearing on defendant's allegations of impropriety in the selection of the jury

venire.[1] Evidentiary hearings were held in February and April 1998.

The hearings supplied details about the Kent County jury selection process. At the time defendant's jury was chosen, the database for jurors was a list of names that the Kent County Court Administrator requested from the Michigan Secretary of State. This list included no information other than names, and was taken from records listing holders of Michigan driver's licenses and holders of Michigan identification cards. The number of names requested was based on the number of jurors the administrator anticipated that all Kent County courts would need for the relevant period.[2]

The next step in jury selection was sending all persons on this list a qualifying questionnaire. About five percent of these questionnaires were returned as undeliverable,[3] and another fifteen to twenty percent were not answered. Those persons who did not answer received a letter from the Chief Judge of the Kent Circuit Court, detailing the penalties for not answering, and encouraging an answer. About half of

---

[1] On remand, defendant's case was consolidated with *People v Palmer* (Court of Appeals Docket No. 174649), which raised a similar issue. *Palmer* is otherwise unrelated to the instant case.

[2] Some time after defendant was tried, Kent County changed this practice, and began requesting all names on the list, rather than a given number.

[3] At the time defendant was tried, no action was taken on undeliverable questionnaires. Kent County changed this practice as well, and currently, when questionnaires are returned as undeliverable, additional questionnaires are sent into the same area where prior attempts resulted in the undeliverable questionnaires.

those who initially did not answer the questionnaire did so upon receiving this letter.[4]

After all answers were received, certain prospective jurors were exempted from service. Some prospective jurors claimed statutory exemptions,[5] and others requested nonstatutory exemptions for individualized reasons, such as lack of transportation or child care, or because of work-related matters. The race of those prospective jurors exempted was not known.

Prospective jurors were then summoned for the Kent County courts. Once summoned, jurors were first selected for the 61st District Court in the city of Grand Rapids, as well as for the other Kent County

---

[4] The Kent Circuit Court Administrator testified that for persons who did not respond to this letter, the standard process was to request that they appear in court to show cause why they had not responded. Those who further failed to appear generally became the subject of bench warrants, although law enforcement agencies refuse to serve the warrants because the warrants lack personal information necessary for their service.

[5] MCL 600.1307a; MSA 27A.1307(1) provides in pertinent part:

(1) To qualify as a juror a person shall:

(a) Be a citizen of the United States, 18 years of age or older, and a resident in the county for which the person is selected, and in the case of a district court in districts of the second and third class, be a resident of the district, and in the case of municipal courts of record, be a resident of the municipality.

(b) Be conversant with the English language.

(c) Be physically and mentally able to carry out the functions of a juror. Temporary inability shall not be considered a disqualification.

(d) Not have served as a petit or grand juror in a court of record during the preceding 12 months.

(e) Not be under sentence for a felony at the time of jury selection.

(2) A person more than 70 years of age may claim exemption from jury service and shall be exempt upon making the request.

district courts.[6] The Kent Circuit Court Administrator attempted to contact any potential jurors that were summoned but did not appear.[7] After district court jurors were selected, all remaining jurors were available for circuit court.

Further, these hearings supplied details about Kent County's population. According to the 1990 census, 8.1 percent of Kent County's population is black, though black adults between the ages of eighteen and sixty-nine comprised 7.28 percent of the county's population. The city of Grand Rapids, within Kent County, however, had a black population of 18.5 percent. Moreover, testimony indicated that minorities are generally underrepresented in census counts, though to what degree is not known.

Next, and more pertinent, the hearings provided details about the composition of Kent County Circuit Court jury pools when defendant's jury was chosen. An expert statistician reported that from April to October 1993, 929 prospective jurors were selected from the Secretary of State lists. On the basis of the 7.28 percent jury-eligible black population in Kent County, he reported that sixty-eight of the 929 prospective jurors could be expected to be black. However, he reported that only fifty-six black prospective

---

[6] Beginning in October 1993, after defendant's trial, jurors were selected first for the Kent Circuit Court. The administrator testified that this change was made because "[t]he belief was that the respective districts essentially swallowed up most of the minority jurors . . . ."

[7] Those prospective jurors who failed or refused to appear may have been ordered to show cause, and if such a person further failed to appear at the show cause hearing, a contempt of court warrant may have been issued. If a warrant was issued, however, the administrator testified that enforcement would be "in the same position that we would be with the larger list." See n 4.

jurors were selected to the list of 929.[8] The trial court accepted the expert's figures as fact.

Finally, testimony at the hearing offered some observations on the Kent County jury selection system. Apparently, minority jury representation in Kent County has long been a problem, with few black prospective jurors appearing in jury pools. Similarly, testimony suggested that statutory exemptions based on felony sentences, or personal exemptions based on lack of child care or transportation, would result in a disproportionate number of minority juror exemptions because minorities are disproportionately affected by these concerns.

After the close of the hearings, the trial court concluded that defendant had not shown that he was denied his right to an impartial jury drawn from a fair cross section of the community. The court noted that it was sympathetic to defendant's dilemma, but stated that defendant had not demonstrated that black jurors were systematically excluded from the jury pool, and that it would not presume that the district courts exhausted the supply of minority jurors. It thus left defendant's convictions in place.

---

[8] The statistician also offered an analysis of the April-October 1993 data in six four-week periods, roughly approximate to the months April through September 1993. For period one, eleven black prospective jurors could be expected, but only eight were present. The remaining periods were as follows: second period, eleven expected, twelve present; third period, eleven expected, six present; fourth period, eleven expected, eleven present; fifth period, twelve expected, eleven present; and sixth period, in which defendant's trial fell, twelve expected, eight present. These figures, as well as those in the text, have been rounded to the nearest whole prospective juror.

Defendant appealed, and the Court of Appeals reversed.[9] The Court's majority believed that black jurors were systematically excluded from circuit court juries because "the juror allocation system in place before October 1993 drained the largest concentration of African-Americans from the master jury list by selecting 61st District Court jury venires first." Dissenting in part, Judge HOEKSTRA noted that when Kent County began selecting circuit court jurors first, the underrepresentation of black jurors decreased only slightly, refuting the idea that the district courts were "draining" away minority jurors. He thus concluded that the evidence produced failed to show a systematic exclusion of black jurors. The prosecution appealed, and this Court granted leave. 461 Mich 896 (1999).

II

The Sixth Amendment of the United States Constitution guarantees criminal defendants a trial by an impartial jury.[10] Our nation's Supreme Court has

---

[9] Unpublished opinion per curiam, issued May 7, 1999 (Docket No. 172558).

[10] In its entirety, the Sixth Amendment provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of counsel for his defence. [US Const, Am VI.]

The Sixth Amendment applies to the states through the Fourteenth Amendment Due Process Clause. *Duncan v Louisiana*, 391 US 145, 154-155; 88 S Ct 1444; 20 L Ed 2d 491 (1968). Our Michigan Constitution also guarantees the right to trial by jury. See Const 1963, art 1, § 14.

stated that the purpose of a jury is to "guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps over-conditioned or biased response of a judge." *Taylor v Louisiana*, 419 US 522, 530; 95 S Ct 692; 42 L Ed 2d 690 (1975), citing *Duncan v Louisiana*, 391 US 145, 155-156; 88 S Ct 1444; 20 L Ed 2d 491 (1968). If distinctive groups in the community are excluded from jury pools, the purposes of a jury go unserved. Therefore, the Court has not only "declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community," but has required that "petit juries must be drawn from a source fairly representative of the community . . . ." *Taylor, supra* at 527, 538. Thus, the Supreme Court has "accept[ed] the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment . . . ." *Id.* at 530.

The fair cross-section requirement, however, does not guarantee that any particular jury "actually chosen must mirror the community . . . ." *Id.* at 538. Rather, the Court explained that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof," for the fair cross-section requirement to be satisfied. *Id.*

When a criminal defendant claims that this requirement has not been satisfied, the defendant must prove the three elements the Supreme Court set forth in *Duren v Missouri, supra. Duren* states:

> In order to establish a prima facie violation of the fair-
> cross-section requirement, the defendant must show (1)
> that the group alleged to be excluded is a "distinctive"
> group in the community; (2) that the representation of this
> group in venires from which juries are selected is not fair
> and reasonable in relation to the number of such persons in
> the community; and (3) that this underrepresentation is due
> to systematic exclusion of the group in the jury-selection
> process. [*Id.* at 364.]

Although I review the lower courts' factual determinations for clear error, I review de novo the courts' legal determination of whether a prima facie violation of the fair cross-section requirement occurred. *United States v Shinault*, 147 F3d 1266, 1271 (CA 10, 1998).

## A. DISTINCTIVE GROUP

Defendant easily satisfies the first prong of the *Duren* analysis. Black Americans are a constitutionally cognizable group because they are capable of being singled out for discriminatory treatment, see *Castaneda v Partida*, 430 US 482, 494; 97 S Ct 1272; 51 L Ed 2d 498 (1977), and have been held a distinctive group for jury composition challenges. See *Peters v Kiff*, 407 US 493, 498-499; 92 S Ct 2163; 33 L Ed 2d 83 (1972); see also *United States v Royal*, 174 F3d 1, 6 (CA 1, 1999) ("blacks are unquestionably a 'distinctive' group for the purposes of a fair cross-section analysis").

## B. FAIR AND REASONABLE REPRESENTATION

To satisfy the second prong of *Duren*, defendant must prove that the number of prospective black jurors in the jury pool is not fair and reasonable in relation to the black population in Kent County. The

United States Supreme Court has never definitively stated the means courts should use to measure whether representation of a distinctive group is fair and reasonable, and it has not indicated the constitutional boundaries of fairness or reasonableness in this context. See Ramsey, People v Hubbard: *Interpreting the fair cross-section requirement of the Sixth Amendment*, 52 Wash U J Urb & Contemp L 419, 427-428 (1997). As a result, courts have applied three different methods of measuring fair and reasonable representation, known as the absolute disparity test, the comparative disparity test, and the standard deviation test. *Id.*

This Court has not previously taken a position on this issue. Similarly, although the Court of Appeals has considered several fair cross-section challenges, see, e.g., *People v Dixon*, 217 Mich App 400; 552 NW2d 663 (1996); *People v Flowers*, 222 Mich App 732; 565 NW2d 12 (1997), only in *People v Hubbard (After Remand)*, 217 Mich App 459; 552 NW2d 493 (1996), did it reach this stage of the *Duren* analysis. The *Hubbard* Court adopted an approach different from those described above. *Id.* at 475-480. I consider all these approaches to measuring whether representation was fair and reasonable, and conclude that no individual method should be used exclusive of the others. Rather, I would adopt a case-by-case approach.

### 1. ABSOLUTE DISPARITY

Most frequently, courts employ the absolute disparity test in Sixth Amendment cases. *Id.* In this context, absolute disparity is defined as "the difference between the percentage of a certain population group

eligible for jury duty and the percentage of that group who actually appear in the venire." *Ramseur v Beyer*, 983 F2d 1215, 1231 (CA 3, 1992). Thus, to calculate absolute disparity, courts subtract the percentage of the distinctive group that was in the jury pool from the percentage present in the population. In the instant case, Kent County's jury-eligible black population was 7.28 percent. Fifty-six of the 929 prospective jurors, or six percent, were black. Thus, the instant absolute disparity was 1.28 percent. This showing is insufficient, as courts have consistently held that absolute disparities less than 11.5 percent do not constitute unfair or unreasonable underrepresentation. *Id.* at 1232 (collecting cases).

The absolute disparity test, though frequently employed, is often criticized as well. As the United States Court of Appeals for the Second Circuit stated:

> The risk of using this approach is that it may too readily tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing. Of course, the Sixth Amendment assures only the *opportunity* for a representative jury, rather than a representative jury itself, . . . but that opportunity can be imperiled if venires regularly lack even the small numbers of minorities necessary to reflect their proportion of the population. [*United States v Biaggi*, 909 F2d 662, 678 (CA 2, 1990).]

This problem is particularly acute when the percentage of the distinctive group eligible for jury service is small. See *United States v Jackman*, 46 F3d 1240, 1247 (CA 2, 1995). In the instant case, for example,

even a complete exclusion of black jurors would result in only a 7.28 percent absolute disparity.

For this reason, the Court of Appeals declined to adopt the absolute disparity test in *People v Hubbard*. Instead, when determining whether representation of black prospective jurors was fair and reasonable, it followed the approach taken in *United States v Osorio*, 801 F Supp 966 (D Conn, 1992). There, the court found substantial underrepresentation when disparity resulted from "non-benign" circumstances, even though the disparity was insubstantial under an absolute disparity test. See *id.* at 978-979. Basically, this approach glances ahead at the evidence of systematic exclusion, and, if it has the appearance of merit, that is a thumb on the scale when deciding whether representation was fair and reasonable.

### 2. COMPARATIVE DISPARITY

Courts frequently discuss the second method, comparative disparity, though they have been reluctant to adopt it. See, e.g., *United States v Hafen*, 726 F2d 21, 24 (CA 1, 1984).

"Comparative disparity is calculated by dividing the absolute disparity by the population figure for a population group. It measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur, supra* at 1231-1232. Here, the absolute disparity was 1.28 percent, so I divide that figure by the jury-eligible black population of Kent County, 7.28 percent, to arrive at a quotient of .18. Thus, defendant's jury pool had eighteen percent less black prospective jurors than could have been

expected on the basis of the black population of Kent County. This figure also does not present the possibility of underrepresentation, as comparative disparities as large as forty percent have been held "borderline," *id.*, and only comparative disparities much larger have been "indicative of a Sixth Amendment violation . . . ." *Shinault, supra* at 1273 ("48%, 50%, and almost 60%").

As alluded to above, however, this test has its critics as well. A problem with this analysis is that "[a] small variation in the figures used to calculate comparative disparity can produce a significant difference in the result . . . ." *Hafen, supra* at 24. The instant case illustrates this point. For example, of the 929 prospective jurors in the pool, had twelve more been black, that is, had one percent changed, black prospective jurors would actually have been overrepresented in the pool. Thus, when the distinctive group's population is small, a small change in the jury pool distorts the proportional representation. This has led most courts to reject the comparative disparity analysis. See *Royal, supra* at 8 (collecting cases).

### 3. STANDARD DEVIATION

A final method of calculating whether representation is fair and reasonable is standard deviation analysis. This analysis explains the probability that the disparity between the percentages of the black population in the relevant community and black prospective jurors in the qualified jury pool is a result of random chance. To determine whether any given disparity is attributable to the variations that can occur in a random selection, courts first ascertain the standard deviation from the expected random allocation of

jurors, and then compare whether the disparity is beyond that standard deviation. Courts calculate the standard deviation by multiplying the number of prospective jurors in the jury pool by the percentage of the distinct group in the population by the percentage of the population that is not in the distinct group, and then taking the square root of that product. The square root is the standard deviation. If the disparity is beyond that standard deviation, then the representation is not fair and reasonable. See *Castaneda v Partida, supra* at 496, n 17 (applying standard deviation analysis to a jury discrimination claim arising under the Fourteenth Amendment); *Jackman, supra* at 1247, n 5; *Ramseur, supra* at 1232.

Here, defendant cannot show that the representation was not fair and reasonable under a standard deviation analysis. The jury pool consisted of 929 names, so we multiply that number by .728 (black population of Kent County), and then multiply by .972 (nonblack population of Kent County), to arrive at the product 657.38, the square root of which is twenty-six.[11] Thus, although defendant could have expected sixty-eight black prospective jurors in the qualified jury pool, the standard deviation for a purely random sample is twenty-six, so the instant allocation is not statistically significant. That is, although the juror allocation is not precisely proportionate to the Kent County population, a purely random sample could standardly produce results varying by twenty-six from the expected number, sixty-eight. Unless the number of black prospective jurors in the qualified jury pool varies from the expected number by twenty-six or

---

[11] This figure has been rounded to the nearest whole number.

more, it is not an extraordinary result based on a random selection. Therefore, the representation was neither unfair nor unreasonable under this analysis.[12]

Generally, courts have applied a standard deviation analysis in Fourteenth Amendment cases, not in Sixth Amendment cases. Ramsey, *supra* at 428, n 59. Although courts have used standard deviation analyses in Sixth Amendment cases, see *Jackman, supra; Ramseur, supra,*[13] "no court in the country has accepted [a standard deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems." *United States v Rioux,* 97 F3d 648, 655 (CA 2, 1996).

### 4. CONCLUSIONS

As I have summarized, each of the methods of measuring whether representation of a distinctive group is fair and reasonable has its advantages and disadvantages. In any given case, the peculiar facts may render any method more or less appropriate, but in every case, the fair cross-section requirement is fundamental to the Sixth Amendment guarantee. Therefore, I would not purport to constrain Michigan

---

[12] The majority characterizes me as "craft[ing] [my] own standard deviation analysis from the available data." *Ante* at 205, n 1. However, the formula I employ to calculate standard deviation is taken from federal case law; the standard is stated in *Castaneda, Jackman,* and *Ramseur.* I apply that standard to the established facts, which were supported by the testimony of the expert statistician. Thus, this crafting of my own analysis is merely an application of a legal standard to established facts, as this Court does in any case.

[13] Notably, *Ramseur* involved both an equal protection claim under *Batson v Kentucky,* 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), and a Sixth Amendment claim under *Duren.* The *Ramseur* court analyzed the claims together, stating that the requirements of each claim are comparable. *Id.* at 1230.

courts to rigidly follow one method. Instead, I believe that courts should analyze representation under all three tests and weigh the different results to ensure that a defendant's right to a jury drawn from a fair cross section of his community is not violated, yet avoiding the pitfalls of the individual tests. Other courts have also analyzed these claims under more than one method, or have acknowledged that such an analysis could be useful. See *Ramseur, supra* at 1231-1232 (using all three analyses); *People v Sanders,* 51 Cal 3d 471, 492-493; 797 P2d 561 (1990) (absolute and comparative disparity); *Jackman, supra* at 1247, n 5 (absolute disparity and standard-deviation-like analysis); *Hafen, supra* at 24 ("comparative disparity calculation might be a useful supplement to the absolute disparity calculation in some circumstances").

Further, the approach taken by the Court of Appeals in *People v Hubbard* is relevant to a determination whether unfair and unreasonable underrepresentation has been shown. Under this approach, a court may glance ahead at the evidence of systematic exclusion when deciding whether representation of the distinctive group is fair and reasonable. When the showing of underrepresentation is close, or none of the methods of analysis are particularly well-suited to a case, a court can consider the defendant's evidence of systematic exclusion. If a jury selection process appears ex ante likely to systematically exclude a distinctive group, that is, the system contains "nonbenign" factors, a court may essentially give a defendant the benefit of the doubt on underrepresentation, even if the system ex post proves to work no systematic exclusion. I agree with *Hubbard* and other courts that have dealt with the shortcomings of each of the

methods of analyzing representation in this manner. See *Ramseur, supra* at 1235; *Biaggi, supra* at 678; *Osorio, supra* at 978-979.[14]

In the instant case, defendant has not shown underrepresentation under either the absolute disparity test, the comparative disparity test, or standard deviation analysis. Under each approach, the underrepresentation in this case was below levels that have been held unfair and unreasonable. However, because the jury-eligible black population of Kent County is small, and the sample of the overall population represented by the jury pools is also small, none of the analytical methods are particularly well-suited to defendant's case. Further, the facial similarity between the jury selection system in the instant case and the system held constitutionally impermissible in *Hubbard* is a thumb on the scale when weighing underrepresentation. Thus, although defendant has not shown unfair and unreasonable underrepresentation under the disparity analyses above, the jury selection process bears the mark of a "non-benign" influence. Leaving this possibility of systematic exclusion unreviewed because the disparities in this case were not large creates the possibility that a systematic exclusion could be acceptable if only its effects were small enough. To prevent this, under the

---

[14] The majority does not approve of my even discussing the decision of the Court of Appeals in *Hubbard* because that case "has not been adequately briefed." *Ante* at 205, n 1. Throughout defendant's brief to this Court, though, he urged us to follow *Hubbard,* and at oral argument, the prosecutor addressed the case at length, and conceded, "I would say you [the Court] have to look at *Hubbard* for guidance." I disagree, then, that we have not been presented with or considered *Hubbard.* Even though *Hubbard* was addressed by the parties, the majority would apparently prefer to decide this case without acknowledging existing Michigan law on this point.

approach taken in *Hubbard*, I would give defendant the benefit of the doubt on underrepresentation, and glance ahead to the third prong of the *Duren* analysis.

### C. SYSTEMATIC EXCLUSION

As a final step in establishing a fair cross-section violation, defendant must show that the under-representation of black jurors was systematic, "that is, inherent in the particular jury-selection process utilized." *Duren, supra* at 366. Like the trial court and the dissenting judge in the Court of Appeals, although I am sympathetic to defendant's position, I simply am not persuaded that defendant has carried his burden on this step. Therefore, because I had considered defendant's challenge under the "glancing ahead" approach of *Hubbard*, he has similarly failed to carry the second step of the *Duren* analysis.

### 1. "SIPHONING"

Defendant primarily argues that the selection of district court jurors before circuit court jurors systematically excluded black jurors from the circuit court pool. By first allocating jurors for district courts in the city of Grand Rapids, with its 18.5 percent black population, and other district courts in Kent County, he contends that most of the available black jurors were siphoned away from the circuit court jury pools. He compares his case to *People v Hubbard, supra*, in which prospective jurors were sent a questionnaire for either district court only or circuit court only depending on their residence. In that case, the defendant showed that this preselection for district court was directing seventy-five percent of black pro-

spective jurors in the county to district court, with only the remaining twenty-five percent available for circuit court. The Court of Appeals held this to be a systematic exclusion. *Id.* at 480-482.

Although the instant case and *Hubbard* have facial similarities, defendant has not shown the effect that similarity had on his case. In *Hubbard*, testimony established that seventy-five percent of jury-eligible black adults were excluded from circuit court jury service because of the allocation system. Here, however, defendant has not shown how the alleged siphoning of black jurors to district court affected circuit court juries. No evidence has shown that district court juries contained more, fewer, or a number approximately equal to the number of minority jurors appearing in circuit court. Defendant has the burden of proof on this issue, but has left me to my own speculation.[15] He thus has not carried his burden of proof.

By holding that defendant has not carried his burden on this issue, I do not condone the practice of selecting district court jurors before circuit court jurors. Such a system was shown to work a constitutional violation in *Hubbard*. Here, though, defendant has simply failed to show that Kent County's former practice effected a constitutional violation.

---

[15] Even as a matter of speculation, and as the dissenting judge below noted, after Kent County stopped selecting district court jurors first, the change in the representation of black jurors in circuit court was small, suggesting that the alleged systematic exclusion was not the cause of the underrepresentation.

2. DISPARATE EFFECTS

Defendant secondly asserts that the system contained factors that could be anticipated to disparately affect black prospective jurors, yet failed to account for that disparate effect. For example, defendant argues that Kent County could anticipate that questionnaires returned as undeliverable would more likely have been returned from an area with a large minority population. Similarly, he argues that minorities are more likely to be nonresponsive to juror questionnaires, and Kent County's failure to effectively pursue nonresponsive questionnaire recipients leads to a smaller number of prospective black jurors. He further asserts that allowing excuses for personal reasons, like lack of child care or transportation, also leads to a smaller number of black prospective jurors because black Americans are more likely to suffer from these types of problems.

These problems, however, are not inherent in the particular jury selection process formerly used in Kent County. First, "[t]he inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes." *Rioux, supra* at 658. Kent County is not required to account for demographic changes in its jury selection process; all that is required is that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups . . . ." *Taylor, supra* at 538.

Similarly, defendant's argument based on Kent County's decision not to pursue prospective jurors that did not return questionnaires fails because it

does not address whether a distinctive group was excluded from jury pools. Whether systematic under-representation is present "turns on the process of selecting venires," *Jackman, supra* at 1248, and here questionnaires were sent to a random list of names. The manner in which the venire was selected, then, was random. Defendant's suggestion that more was necessary amounts to a request for extra-constitutional action, and Kent County "does not have an obligation under the Sixth Amendment to affirma-tively counteract 'private sector influences' . . . ." *United States v Purdy*, 946 F Supp 1094, 1104 (D Conn, 1996) (holding that a failure to send follow-up jury questionnaires to persons that did not respond to an initial questionnaire was not a constitutional viola-tion). Relevant to this argument as well is defendant's failure to show that any of the persons that did not respond were black.

Defendant's contention that exemptions based on personal reasons were a systematic exclusion of black prospective jurors fails as well. Initially, per-sons granted exemptions were racially unidentified, so the suggestion that granting personal exemptions resulted in fewer black prospective jurors is, at best, supported by generalized testimony. The exemptions could have resulted in fewer white prospective jurors, fewer black prospective jurors, or no change in the jury pool make-up whatsoever. Further, defendant's suggestion that black prospective jurors would be more likely to request personal exemptions is again attributable to outside social forces rather than sys-tematic exclusion of black prospective jurors, and again Kent County was not required to affirmatively counteract outside forces. Also, exemptions based on

personal hardship have been held permissible even when the exempted prospective juror's race was known, and the prospective juror was a member of a distinct group. *People v Howard*, 1 Cal 4th 1132, 1160-1161; 824 P2d 1315 (1992) (holding that exemptions for Hispanic prospective jurors because of doctor's appointments, loss of income, and difficulty being absent from work were not constitutional violations). Therefore, this argument is also not persuasive.

I reiterate that "a finding that . . . disparities are not unconstitutional is not the same as an endorsement of such discrepancies." *United States v Reyes*, 934 F Supp 553, 566 (SD NY, 1996). Defendant's arguments should give pause to anyone who suggests that black Americans have achieved socioeconomic parity with white Americans. However, defendant's arguments just do not demonstrate that Kent County's jury selection process systematically excluded black prospective jurors.

### 3. STATISTICAL PROOF

Finally, defendant argues that the statistics alone sufficiently show that black prospective jurors were systematically excluded from Kent County jury pools. He contends that the persistent underrepresentation shows that random chance could not have produced such a result.

In *Rioux*, *supra*, the Second Circuit Court of Appeals confronted a similar claim that statistics alone prove systematic exclusion. That court stated: "Without accepting the canard that if you torture the statistics long enough, they'll say anything you want them to, it remains unclear whether statistics alone

can prove systematic exclusion. Even if they can,
however, they would have to be of an overwhelmingly
convincing nature." *Id.* at 658 (internal citations omit-
ted). Several courts, however, have clearly stated that
statistics alone cannot prove systematic exclusion.
See *United States v Pion,* 25 F3d 18, 24 (CA 1, 1994)
(holding that an allegation of systematic exclusion
based on statistics alone was "pure speculation");
*United States v Garcia,* 991 F2d 489, 492 (CA 8, 1993)
(holding that numerical underrepresentation is not a
proxy for systematic exclusion); *Howard, supra* at
1160 ("A defendant cannot carry this burden with
nothing more than statistical evidence of a disparity.
One must, in addition, show that the disparity is the
result of an improper feature of the jury selection
process").

Even presuming that defendant could rely exclu-
sively on statistics, he has not made an adequate
showing. In *Duren,* the Court noted that the defen-
dant proved that a large discrepancy was occurring in
every weekly venire for a period of nearly a year.
*Duren, supra* at 366. Here, defendant's proof may sat-
isfy any duration requirement, because there was
some underrepresentation in five of the six periods
surveyed, but the disparities over that time were
nowhere near as large as those in *Duren.* The abso-
lute disparity in *Duren* was thirty-nine percent, and
the comparative disparity was sixty-five percent.[16] In
the instant case, defendant could not make a showing

---

[16] In *Duren,* the distinctive group comprised fifty-four percent of the
population, but only fifteen percent of the jury pools. *Id.* at 365. Applying
the formulas detailed in part II(B) supplies the figures mentioned in the
text. Standard deviation is not available because the data necessary for
the calculation were not supplied in the Court's opinion in *Duren.*

of unfair and unreasonable underrepresentation under any of the disparity analyses. Thus the defendant's statistics are not so "overwhelmingly convincing." Without a showing that the disparity was "the result of an improper feature," *Howard, supra* at 1160, defendant cannot prevail.

III

Because defendant has not made the requisite showings under *Duren v Missouri,* I would reverse the decision of the Court of Appeals. I would remand this case to the Court of Appeals for consideration of defendant's issues that were not previously reviewed.

KELLY, J., concurred with CAVANAGH, J.