*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TINA MARIE HARBERT,

        Defendant-Appellant.

UNPUBLISHED
February 21, 2019

No. 341471
Jackson Circuit Court
LC No. 15-005682-FC

Before: M. J. KELLY, P.J., and SERVITTO and BOONSTRA, JJ.

PER CURIAM.

Defendant, Tina Harbert, appeals as of right her jury trial convictions of two counts of first-degree child abuse, MCL 750.136b(2). The trial court sentenced Harbert to 5 to 20 years' imprisonment. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

In November 2015, Harbert's children, CH and JH, were admitted to the Allegiance Health emergency department for injuries caused by child abuse. The most significant injuries were to the children's buttocks. CH's buttocks were misshapen, appeared abnormal, and were swollen because of repetitive trauma. JH's injuries were more severe. The emergency room physician explained that JH had large, open, and weeping wounds across the entire length of his buttocks. He added that "the skin was pretty much absent from an area of his buttocks and just the fatty tissue underneath was there and kind of weeping." The physician explained that JH's wounds were "significantly painful" and would affect a person's ability to sit or walk. In fact, at the hospital, JH did not want to sit because of the injuries. JH was admitted to the hospital, and was not discharged until over a week later because of the severity of his injuries. Moreover, the record reflects that, even a month later, the wound was still open and his buttocks were still misshapen. CH's buttocks also remained misshapen a month after the initial hospital visit. In addition to the injuries to their buttocks, both children had scars. CH had a scar on the back of his hand by his knuckle and irregularly shaped scars on his right shoulder and abdomen, which he attributed to being struck by a dog leash by his father. JH also had scars on his back and his right arm had an infected wound.

Both CH and JH testified that their injuries and scars were primarily caused by James Harbert, their father, who would repeatedly hit them with a 2x4 piece of wood, a dog leash, and his fists.[1] The children described how the injuries caused by the beatings made them bleed to the point where their clothing would stick to their skin. JH testified that he was forced to wear diapers because the bleeding would seep through his underpants. JH added that he was unable to sleep on his back because it hurt, and he explained he walked differently because of the injuries. Similarly, CH testified that he was in a tremendous amount of pain and that he could not sit down or walk normally. CH recounted that the abuse in his parents' home was so bad that he tried to kill himself with a dog leash because he "couldn't take the pain anymore." When he told Harbert of the attempt, she said only that "she was glad" that he did not die.

Both children testified that their father would choke them until they passed out or got dizzy, and they described how sometimes they were deprived of food for days at a time or were made to sleep in the dog kennels in the basement. They testified that Harbert was aware that they were deprived food, and JH told the jury about one time when she snuck him a piece of pizza.

CH and JH testified that their mother witnessed them being beaten by their father and that she would also hit them with a 2x4 board. JH testified that when Harbert struck him it was not as bad as when his father would hit him, and he described it "like maybe a crack or something." CH testified that Harbert hit him with a lot less force than his father did. Additionally, however, they both testified that Harbert would bandage their injuries when she could and would provide them with painkillers. The record reflects that, despite knowing that CH attempted to commit suicide, Harbert never sought out mental health treatment for him. Additionally, although she was aware that the children were being beaten by her husband—and although she was hitting them with a board and bandaging their bleeding buttocks—Harbert never sought out medical treatment for the children. Indeed, she admitted to the police that she had spanked JH with a board in the morning on the day he was removed by Child Protective Services (CPS).

At trial, the defense theory was that Harbert was a victim of James Harbert and that her actions and her failure to protect the children from her husband did not amount to first-degree child abuse. After deliberation, however, the jury convicted her as charged.

This appeal follows.

---

[1] James Harbert was tried jointly with Harbert before a separate jury. Midway through JH's testimony, he pleaded guilty to two counts of first-degree child abuse. This Court denied his application for delayed leave to appeal his sentence. *People v Harbert*, unpublished order of the Court of Appeals, entered June 26, 2018 (Docket No. 343511). Our Supreme Court also denied his application for leave to appeal. *People v Harbert*, 919 NW2d 773 (2018).

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

Harbert first argues that there is insufficient evidence to support her convictions for first-degree child abuse on an aiding and abetting theory. A challenge to the sufficiency of the evidence is reviewed de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "[W]hen determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992). Circumstantial evidence, including reasonable inferences arising from the evidence, is sufficient proof of the elements of a crime. *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

### B. ANALYSIS

"A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child." MCL 750.136b(2). " 'Serious physical harm' means any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." MCL 750.136b(1)(f). " 'Serious mental harm' means an injury to a child's mental condition or welfare that is not necessarily permanent but results in visibly demonstrable manifestations of a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." MCL 750.136b(1)(g).

Harbert was prosecuted under an aiding and abetting theory.[2] Aiding and abetting is not a separate criminal offense. *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006). "Rather,

---

[2] Because Harbert was convicted under an aiding and abetting theory, we need not determine whether there was also sufficient evidence to convict Harbert of first-degree child abuse as a principal rather than an abettor. Yet, we are compelled to note that the failure to take an action or the decision to leave children in a dangerous situation with the knowledge that serious harm will result can be first-degree child abuse under certain circumstances. See *People v Maynor*, 470 Mich 289, 291, 295-296; 683 NW2d 565 (2004) (mother left children in hot car); *People v Portellos*, 298 Mich App 431, 445; 827 NW2d 725 (2012), overruled on other grounds by *People v Calloway*, 500 Mich 180; 895 NW2d 165 (2017) (mother failed to seek medical attention for baby). Thus, Harbert's failure to protect her children from her husband ostensibly could serve as the basis for a conviction of first-degree child abuse as a principal provided that when she left the children with her husband she knew that leaving them would cause serious harm. Again, however, as the jury was charged with deciding the case on an aiding and abetting theory, we

being an aider and abettor is simply a theory of prosecution that permits the imposition of vicarious liability for accomplices." *Id*. (quotation marks and citation omitted). Anyone who "procures, counsels, aids, or abets" in the commission of a criminal offense may be prosecuted as if he or she committed the offense directly. MCL 767.39. "To support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time [the defendant] gave aid and encouragement." *People v Carines*, 460 Mich 750, 757-758; 597 NW2d 130 (1999) (alteration in original). "An aider and abettor's state of mind may be inferred from all the facts and circumstances." *Id*. (quotation marks and citation omitted).

It is undisputed that there is sufficient evidence to support that the crimes charged—two counts of first-degree child abuse—were committed by Harbert's husband. The children testified that he repeatedly beat them with dog leashes, his fists, and a 2x4 board. The beatings left their buttocks bleeding, swollen, and misshapen to the point where, even over a month after their removal from their parents' home, the injuries inflicted had still not healed. Harbert's husband also choked the boys to the point of unconsciousness and denied them the "privilege" of eating for days at a time. Because of the abuse, the older child attempted to commit suicide by hanging himself with a dog leash. His brother intervened to save his life. After removal from the home, both boys exhibited signs of mental trauma caused by the abuse which manifested in behavioral problems in their maternal uncle's home. The children required therapy, and, at trial, one of the boys expressed an ongoing concern that his buttocks were still misshapen. The record reflects that the abuse had been ongoing for as long as the children could remember, and there was also testimony that it occurred multiple times per week. On this record, there is no reasonable doubt that the crime of first-degree child abuse was committed by Harbert's husband.

In addition, there is sufficient evidence to support the jury's finding that Harbert "performed acts or gave encouragement that assisted the commission of the crime." *Carines*, 460 Mich at 757-758. First, Harbert herself would spank the children with a 2x4 board which she would make them retrieve before striking them across their buttocks. This fact is supported by the testimonies of her children and from Harbert's own admissions to a police detective when confronted with the abuse. In addition, the children's testimonies makes clear that Harbert would spank them with a board either at the direction of their father or as discipline because she was mad at them for misbehaving. Although both children testified that their mother did not hit them as hard as their father did, they nevertheless expressed that it was painful because of the unhealed injuries to their buttocks.

On appeal, Harbert suggests that the spankings she imposed were less severe. However, the children's testimony was that their buttocks were bleeding and sore to the point where it was difficult to sit or walk. One child testified that before he could use the bathroom he had to peel

---

will confine our analysis of the sufficiency of the evidence to whether there was sufficient evidence under an aiding and abetting theory.

his underwear from his skin. A reasonable jury could infer that an injury too painful to sit upon is an injury that would cause significant pain even if it was just "tapped" with a board. Additionally, testimony from medical personnel also confirmed that additional trauma to the children's buttocks would be significantly painful. Furthermore, contrary to Harbert's contentions, when viewed in the light most favorable to the jury's verdict, the record also reflects that Harbert was aware that the children were in pain as a result of the beatings. One child testified that he "mostly" complained about the pain to Harbert, and the other child testified that Harbert would occasionally give him ibuprofen for pain management. Harbert also bandaged the children's buttocks, and, although she argues that there is no testimony supporting what condition the children's buttocks were in when she did so, it is reasonable to infer that the injuries were severe enough to require bandages. Moreover, there was testimony that one month after being removed from his parents' care, JH's buttocks still had an open wound. He testified at trial that his buttocks were still not fully healed and made him feel "weird." Given how long it has taken for the injury to heal, a jury could determine that when Harbert bandaged the wounds, she knew the children were being excessively beaten, especially when coupled with the testimony that the children could not walk or sit properly because of the pain they were experiencing. Thus, viewing the evidence in the light most favorable to the jury's verdict, it is reasonable to infer that Harbert directly assisted her husband with the extreme physical discipline of the children, which aided him in committing first-degree child abuse.[3]

Next, Harbert provided assistance by helping to conceal the abuse being inflicted on the children. The jury could infer that she did this by neglecting to provide them with medical attention despite knowing that they had severe injuries on their buttocks and were in pain. Harbert chose not to seek mental health treatment after learning that CH had attempted to commit suicide because of the pain he was experiencing. The jury could infer that she did so because a mental health provider would discover that he attempted to kill himself because of the fiendish abuse being inflicted on him. Furthermore, it is reasonable to infer, as explained above, that she was aware of the severe injuries on the boys' buttocks, given that they both testified that she would sometimes bandage their buttocks. Again, the medical testimony was that their buttocks were swollen and misshapen, and one of the children had to be hospitalized for over a week immediately after being removed from his parents' care. They both testified that the wounds bled, which caused their clothing to stick to their skin. Further, both testified that sitting and walking was difficult because of the pain. Yet, instead of providing them with proper medical treatment, Harbert only bandaged their buttocks on occasion and sometimes provided them with pain medication. Moreover, the children testified that when they were being beaten by their father, Harbert would cry and was upset. There was also testimony that the children

---

[3] On appeal, Harbert argues that the children testified that she attempted to protect them from the physical abuse and that she would always be crying when they were struck. However, the jury was not required to credit this testimony. See *People v Perry*, 460 Mich 55, 63; 594 NW2d 477 (1999) (stating that a jury may choose to believe part of a witnesses testimony and not others). Based on the evidence presented, the jury could have reasonably inferred that the children were attempting to minimize their mother's involvement as their testimony did show that they had a strong bond to her.

would scream and cry when struck, and one child testified that their cries interrupted Harbert's sleep so she would sleep in an RV on the property. Thus, even if a jury did not find that she knew of the extent of the children's injuries from the times she bandaged their buttocks, the jury could reasonably determine that despite knowing the children were being severely beaten by their father, she knowingly chose to remain ignorant of the extent of their injuries by not taking any steps to ascertain whether they needed medical attention.

There was testimony that Harbert kept other individuals from knowing the extent of the injuries. Harbert's mother testified that whenever she attempted to speak to her daughter about the children's father, Harbert would tell her to "mind your own business" and told her that she was "not going to talk about it." The record also reflects that shortly before Child Protective Services (CPS) became involved in the case, Harbert's parents discovered the injuries on CH's buttocks and confronted Harbert. In particular, Harbert's mother testified that she asked Harbert to check on JH, and she recounted that Harbert stated that JH was "fine" and that she did not see any injuries on him. Given the extent of JH's injuries—which required hospitalization and were still open wounds a month after removal—a jury could reasonably infer that when Harbert stated JH was "fine," she was lying about JH's condition in order to protect her husband. Harbert's actions in attempting to conceal or minimize the injuries being inflicted on her children were a form of assistance provided by Harbert to her husband that aided in the commission of the crimes.

Furthermore, Harbert aided in the commission of the crime by telling the children they were at fault for the abuse. Both children recalled that when Harbert would discuss the abuse with them, she would do so by explaining that their bad behavior was bringing on the punishment. Thus, Harbert did not condemn her husband's actions; she instead blamed the children for what was happening to them. She explained to a police detective that she did not abuse her dogs or strike them with a board because "they don't lie to me or do anything wrong." Viewing the evidence in the light most favorable to the jury verdict, this evidence reflects that Harbert shifted blame for the injuries from her husband, who was beating the children to the point of physical disfigurement, to the children for their misbehavior. By keeping the children under the belief that they were the problem, she discouraged them from seeking aid from others, such as family members or members of the community.[4]

Finally, there was sufficient evidence to support the jury's finding that when Harbert provided the above aid to her husband, she knew that he intended the commission of the crime of

---

[4] The children were homeschooled and did not have much contact with individuals outside their home. However, there is nothing on the record directly suggesting that Harbert wanted the children to be homeschooled in order to conceal the abuse. Yet, it is reasonable to infer that they were homeschooled because their parents were using them to care for the 20 to 30 dogs in their basement kennel. The record reflects that the Harberts would breed dogs and would watch other people's dogs when they were out of town. The children testified that they were responsible for walking the dogs, feeding and watering the dogs, and cleaning their kennels. They were disciplined when they failed to carry out their responsibilities to their parents' satisfaction.

first-degree child abuse. *Id*. at 758. It is true that, mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of the crime. *People v Wilson*, 196 Mich App 604, 614; 493 NW2d 471 (1992). However, again, contrary to Harbert's assertions on appeal, there was sufficient evidence to support a finding that she knew how severely the children were injured. They testified that they were beaten multiple times a week and that the abuse had been going on for as long as they could remember. Again, the beatings left their buttocks swollen, bleeding, and misshapen, and they were in so much pain that they could not sit or walk properly. Harbert witnessed the beatings by her husband and also spanked the children with a board. She bandaged their injuries, was told that they were in pain, and sometimes gave them pain medication. Given the extent of the injuries, a jury could—and did—infer that she intended her husband to commit the crime of first-degree child abuse against both of her children at the time she provided aid. Furthermore, given that she directly provided aid to her husband in his abuse of the children, such as concealing the children's injuries, declining to seek medical attention, and actively participating in striking them with a 2x4 board, it cannot reasonably be argued that she was merely present when her husband was committing the crime. Instead, the evidence leads to the reasonable inference that Harbert and her husband were acting in concert when disciplining the children. Consequently, viewing the evidence in the light most favorable to the jury's verdict, there was sufficient evidence to support both convictions under an aiding and abetting theory.[5]

## III. PROSECUTORIAL MISCONDUCT

## A. STANDARD OF REVIEW

Harbert next argues that she is entitled to a new trial because of prosecutorial misconduct or, in the alternative, because her trial lawyer was ineffective for failing to object to statements in the prosecutor's closing and rebuttal arguments. To preserve an issue of prosecutorial misconduct, the defendant "must contemporaneously object and request a curative instruction." *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016) (quotation marks and citation omitted). Here, with the exception of one comment, Harbert did not object to the prosecutor's statements. Accordingly, the majority of her claims are unpreserved and will be reviewed for plain error affecting her substantial rights. See *id*. at 201-202. "To obtain relief generally requires a showing of prejudice; specifically, that the error affected the outcome of the lower court proceedings." *Id*. at 202. The preserved claim, however, is reviewed de novo to determine whether Harbert was denied a fair and impartial trial. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). This Court "will not find error requiring reversal if a curative instruction could have alleviated the effect of the prosecutor's misconduct." *People v*

---

[5] On appeal, Harbert contends that she cannot be held liable under an aiding and abetting theory simply for failing to protect her children. However, as explained above, Harbert's actions in this case plainly amount to more than a mere failure to protect. Accordingly, we need not address whether failure to protect—without more—is sufficient to support the convictions for first-degree child abuse on an aiding and abetting theory.

*Lane*, 308 Mich App 38, 62; 862 NW2d 446 (2014). Moreover, "[w]hen no *Ginther*[6] hearing has been conducted, our review of a defendant's claim of ineffective assistance is limited to mistakes that are apparent on the record." *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

## B. ANALYSIS

Claims of prosecutorial misconduct are reviewed on a case-by-case basis, "with the reviewing court examining the pertinent portion of the record and evaluating the prosecutor's remarks in context." *People v Akins*, 259 Mich App 545, 562; 675 NW2d 863 (2003) (quotation marks and citation omitted). "The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial (i.e., whether prejudice resulted.)." *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003). When seeking to obtain a conviction, prosecutors must take the highest care to remain mindful that their "role and responsibility is to seek justice and not merely convict." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). Thus, although prosecutors have "discretion on how to argue the facts and reasonable inferences arising therefrom, and are not limited to presenting their arguments in the blandest terms possible," prosecutors must refrain from arguing facts not in evidence when presenting his or her case to the jury. *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011). Similarly, "it is improper for a prosecutor to appeal to the jury's sympathy for the victim." *Dobek*, 274 Mich App at 80. "Nor may a prosecutor urge the jury to convict as part of its civic duty or on the basis of its prejudices." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). Relying on those means of obtaining a conviction injects issues broader than the defendant's guilt or innocence into a trial and can jeopardize a defendant's opportunity for a fair trial. See *Dobek*, 274 Mich App at 63-64.

We first address the preserved allegation of prosecutorial misconduct. During closing argument, the prosecutor argued that Harbert was guilty because she failed to protect her children. Harbert's lawyer objected, arguing that the law did not allow for a conviction of first-degree child abuse merely for the failure to protect children from harm. The court cautioned that it would provide instructions on the law and the prosecutor also urged the jury to follow the judge's instructions on the law. The jury was, thereafter, properly instructed on the elements of first-degree child abuse on an aiding and abetting theory. There are no errors with the instructions provided. Thus, even assuming *arguendo* that the prosecutor misstated the law during closing argument, any error was cured by combination of a timely objection, the judge's immediate comments, the prosecutor's statements that the jury should follow the law as instructed by the judge, and the jury instructions provided. See *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998) (stating that jurors are presumed to follow their instructions). A separate curative instruction was not necessary under the circumstances, nor was Harbert's lawyer ineffective for failing to request one because the jury was properly instructed.

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Next, we address the unpreserved allegations of prosecutorial misconduct. First, Harbert argues that the prosecutor improperly appealed to the jury's sympathy with the following arguments:

> The hard part for me to have to listen to is that the boys would have to listen to each other cry when the other one was getting beaten. That they would have to listen to the other one endure the abuse. And what does she do? She sleeps in the camper so she can get a good day's or night's rest, she's not disturbed by the screaming.

> *At one point I wondered if perhaps [the children] ever called out to her for help or yelled for mom and she wasn't there? I wonder at one point if they just stopped calling out for mom because they knew she wouldn't come?*

Even if we were to conclude that this argument is improper, it does not rise to the level of reversible error because (1) the jury was properly instructed to decide the case based on the evidence and was warned to not let sympathy influence its decision, (2) a curative instruction could have alleviated any prejudicial effect, and (3) the flaws in the prosecutor's argument were tactfully explored by Harbert's lawyer during his closing argument when he pointed out that the arguments were not based on evidence and were instead another "fabrication" by the prosecution in support of its "garbage" case. See *People v Callon*, 256 Mich App 312, 329-330; 662 NW2d 501 (2003) ("Further, we cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect.").[7]

Next, the prosecutor argued:

> But, [Harbert] chose to leave at least one child at home all the time, and why is that? Because they needed someone to stay home and run the dog business in the basement. *As a mother, I just cannot imagine hitting my child with a board. I can't imagine hitting my child with a board on top of an injury like this. The instinct to protect your children as a parent is just that, it's an instinct. It should come naturally. It should be just like breathing or your heart beating. It essentially becomes part of who you are as a person when you become a parent.*

> Can you imagine a 10 year old boy coming to you and saying, "I tried to hang myself with a dog leash," and your response is, "Well, I'm glad you're alive?" She did nothing. She didn't get him any help. And that didn't even appear to be an eye opener for her, if anything was, or should have been an eye

---

[7] Harbert argues her lawyer provided ineffective assistance by not objecting to this comment. Although we agree that the comment was improper, it is clear that the defense strategy was to address the impropriety of it during closing argument in order to attack the credibility of the prosecutor's entire case by suggesting it was built on fabrications. See *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004) (stating that a trial strategy does not constitute ineffective assistance simply because it does not work).

opener, that wasn't, to say this has gone too far, [James Harbert] and I need to stop. *She's their mom. She's supposed to be the safe place for them to fall and she was nothing but cold, hard concrete. It is her job to protect those boys.*

This argument, although harshly worded, is a fair argument based on the evidence admitted. The children testified that Harbert hit them with a board. They testified that when she did so, they had painful injuries on their buttocks caused by the beatings inflicted by their father. CH testified he tried to kill himself and, when he told his mother, she only responded that she was glad he was alive. Furthermore, the children testified that they told their mother that they were in pain from the abuse. And Harbert made statements to the police that she had no need to beat her dogs because they did not lie to her or misbehave. Taken together, the evidence suggests that Harbert neglected her duty to protect her children because she was "cold, hard concrete" and was not functioning as a mother should. Although this argument was undoubtedly a "hard blow," it was not a "foul" one. *People v Blackmon*, 280 Mich App 253, 268; 761 NW2d 172 (2008) (quotation marks and citation omitted). Moreover, even if tangentially improper, this argument was responsive to the defense theory that Harbert, like her children, was a victim of her husband's abuse who wanted to protect her children but lacked the courage or support to do so. See *Dobek*, 274 Mich App at 67 (noting that otherwise improper comments may be permissible in response to the defense argument). Finally, because the argument was proper, Harbert cannot sustain her claim that her lawyer was ineffective for failing to object to this line of argument.

Harbert next argues that the following argument was improper:

But what was she doing to assist him? She was lying so that this could continue. In 2009 [CH] went to school with a black eye, she lied to the police, she lied to CPS and she lied to the medical personnel at the hospital. In 2011 when [CH] went to the emergency room yet again because [his father] broke his knuckle, she went with him, [Harbert] went to the emergency room with [CH] and she lied to them. In 2015 she lied to Detective Reed, she told him she didn't know about the injuries, she didn't know that they were that bad. She lied and told Detective Reed that [the children] were never choked, they were never punched. She told him that [CH] was the main problem in the house. She moved [CH] to her parents' home because she thought it would calm things down at home. She didn't feel that [her husband], or even she was a problem. She didn't want [her husband] prosecuted. She wanted the family to get counseling.

It was reasonable to infer that Harbert was, in fact, lying to protect the children's father. There was testimony that the abuse had been going on weekly for years, that Harbert witnessed at least some of the beatings, and that she bandaged the children's buttocks. There was also testimony supporting that CPS did not substantiate child abuse in 2009 despite CH's black eye. Further, in 2011, CH did go to the hospital and, although the abuse was ongoing, nothing was said by Harbert to the medical personnel that raised any red flags. The statements attributed to Harbert by Detective Reed are also reflected in the record. Thus, although Harbert's view of the evidence is different than the image painted by the prosecution, the argument was nevertheless based on the evidence and is not improper. And, again, as there was no prosecutorial misconduct, Harbert cannot sustain her claim of ineffective assistance premised on her lawyer's failure to object.

Harbert also argues that the prosecutor improperly argued that she had, but did not take, "multiple opportunities to get herself and the kids" away from her husband. That argument was appropriately based on the evidence presented, however. Notwithstanding Harbert's contention that "the prosecutor has no idea what went on in Tina's relationship" with the children's father, the record did reflect that she was frequently out of the house and that she could also take the children with her when she left. The argument was, therefore, not improper, nor was Harbert's lawyer ineffective for not objecting to it.

The prosecutor also argued during rebuttal that there was no evidence of domestic violence in the house other than the children's belief that Harbert was also hit by the father. This argument was responsive to the testimony at trial and to the defense argument that Harbert was a victim. Although the defense could—and did—argue that it was reasonable to infer domestic violence by James Harbert against Harbert—the prosecutor was not required to also argue those inferences in her rebuttal argument. The argument was not improper and Harbert's lawyer was not ineffective in how he responded it.

Finally, at the closing the prosecutor's argument, she stated:

> [Harbert] is not the victim here. We weren't looking at pictures of her injuries on the big screen. This is really all for [CH] and [JH] right now. It is sad to me that no one came forward to advocate for [CH] and [JH] when they were in this situation. No one really did much to stop what was going on. Now that job is handed off to you, you are their advocate. It is time for [Harbert] to be accountable for the hell and the horrors that the boys went through.

The first part of this argument is proper as it is in direct response to the defense argument that Harbert was a victim. However, the remainder of the argument was flagrantly improper. At the outset, it is an unabashed request for the jury to decide the case based on its civic duty to protect two horrifically abused children after no one else "did much to stop what was going on." A prosecutor may not resort to duty arguments because they inject issues into the trial that are broader than a defendant's guilt or innocence of the charges and because they encourage the jurors to suspend their own powers of judgment. *Abraham*, 256 Mich App at 273. Compounding the matter, the prosecutor—at the close of her argument—asked the jury to abandon its role as an impartial factfinder and instead take up the mantle of advocate. "The Sixth Amendment of the Unites States Constitution guarantees criminal defendants a trial by an impartial jury." *People v Smith*, 463 Mich 199, 213; 615 NW2d 1 (2000). Thus, by asking the jury to discard its constitutional role, the prosecutor's comments undercut the fairness of Harbert's trial.

Having determined that the prosecutor's comments were improper, we must determine whether reversal is required. "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Carines*, 460 Mich at 763-764 (quotation marks and citation omitted). Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, *People v. Humphreys*, 24 Mich App 411, 414; 180 NW2d 328 (1970), and jurors are presumed to follow their instructions, *Graves*, 458 Mich at 486.

-11-

In context, the improper comments were isolated and brief. Further, after the prosecutor's closing argument, Harbert's lawyer gave his closing argument, which he ended by stating:

> Don't get caught up in any of this garbage. You heard it. Really, the only two people that testified in this case that mean a damn was those two boys. You are not speaking to those boys. This is the criminal justice system, you're not their advocates. Your job is to follow the law and the only choice you have is to find Tina Harbert not guilty. Thank you.

Thereafter, the court instructed the jury that it had to decide the case based solely upon the evidence admitted and the court's instructions on the law. The court further instructed that the jury must not let sympathy or prejudice influence its decision. Additionally, a curative instruction could have also significantly diminished the prejudice from this improper comment. See *Callon*, 256 Mich App at 329-330.[8]

Affirmed.

/s/ Michael J. Kelly
/s/ Deborah A. Servitto
/s/ Mark T. Boonstra

---

[8] Although Harbert's lawyer could have objected to the improper comment and requested such a curative instruction, it is apparent that he chose to address it by attacking the comment during his own closing argument. This was in line with his strategy that the prosecutor had a weak case and was making unsupported arguments and making every argument conceivable to support its "garbage" case. Although unsuccessful, Harbert's lawyer did not provide ineffective assistance by using this particular trial strategy as opposed to objecting. See *Matuszak*, 263 Mich App at 61.